/s/ John D. Minton, Jr.
    CHIEF JUSTICE

ST. LUKE HOSPITAL, INC.; E. Krebs, R.N.; T. Theisen; John Fey; John Howard Harris; and Ernest Pretot, Appellants,

v.

Shannon STRAUB, Appellee.

No. 2009–SC–000027–DG.

Supreme Court of Kentucky.

Oct. 27, 2011.

Scott M. Powers, Lange, Quill & Powers, PLC, Newport, KY, for appellants.

Michael Jay O'Hara, Mary Suzanne Cassidy, O'Hara, Ruberg, Taylor, Sloan & Sergent, Covington, KY, for appellee.

Opinion of the Court by Chief Justice MINTON.

We granted discretionary review to consider whether an individual may bring a civil action for money damages under Kentucky Revised Statutes (KRS) 446.070 on the basis of an alleged violation of a provision of the Kentucky Constitution. In addition to traditional common law tort claims, Shannon Straub made a claim for money damages based upon the alleged violation of her substantive due process interests under the Kentucky Constitution. Straub alleges that St. Luke Hospital, some of its nurses and security guards, and the emergency room physician acted under the direction of a city police officer to violate her due process interests by forcibly restraining her, stripping and gowning her, and extracting blood and urine samples from her without her consent, the consent of a parent, or a court order.

We hold that an action for money damages under KRS 446.070 is not available for alleged constitutional violations, and we

decline Straub's invitation to create judicially a new constitutional tort in Kentucky because adequate remedial alternatives exist in the common law.

Our conclusion on these issues differs from the result reached in this case by the Court of Appeals, which we reverse by our decision here. We further disagree with the decision of the Court of Appeals to reverse the trial court's evidentiary rulings at the trial of this case, so we reinstate the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND.

### A. Straub Arrested by Wilder Police Officer Kilgore and Taken to St. Luke Hospital Emergency Department.

Sixteen year-old Straub arrived with friends shortly after midnight at a party at an apartment in a condominium complex. She spent the rest of the night there. Around 6 a.m., she emerged from the apartment to retrieve her backpack from her friend's car. When she attempted to return to the apartment, she could not find it, so she started ringing doorbells and awakening residents around the complex. Several residents called the police to report this disturbance.

Wilder Police Officer Kilgore arrived to find an apparently disoriented Straub wandering the complex ringing doorbells. He immediately thought she might be intoxicated. According to Officer Kilgore, Straub's gait was unsteady, her pupils dilated, and her speech slurred. And he detected on her the odor of marijuana.

Straub was unwilling or unable to give Officer Kilgore accurate information, including her name and address, how she arrived at the condominium complex, and whether she had been drinking or taking drugs. Kilgore suspected that Straub recently used drugs or suffered some kind of disorienting head injury. Failing in efforts to find anyone at the condominium complex to identify Straub, Officer Kilgore took her to police headquarters where he attempted to locate her family or friends.

Straub gave Officer Kilgore several phone numbers. After fruitless attempts to contact anyone at the phone numbers Straub provided, Officer Kilgore contacted the court-designated worker,[1] who instructed Officer Kilgore to take Straub to a hospital.

Officer Kilgore took Straub to the emergency department at St. Luke Hospital where he asked the staff to determine whether she needed emergency medical treatment. Officer Kilgore informed the staff that he suspected Straub had been using drugs and may have suffered a head injury. Dr. David Allen, the emergency room doctor, directed the hospital staff to put Straub in a hospital gown and ordered a toxicology screen. Straub refused to cooperate and became combative. Ultimately, hospital personnel and Officer Kilgore physically restrained Straub. Hospital personnel stripped Straub of her clothing, placed her in a hospital gown, applied four-point leather restraints, drew blood, and extracted a urine sample through forced catheterization. Meanwhile, a hospital employee reached Straub's mother, who arrived after Straub

---

1. A creature of Kentucky's Juvenile Code, the court-designated worker is an individual designated by the Administrative Office of the Courts for the purpose of placing children in alternative placements prior to arraignment, conducting preliminary investigations, and formulating, entering into, and supervising diversion agreements and performing such other functions as authorized by law or court order. KRS 600.020(16).

was restrained and forced to give blood and urine samples.

Lab reports of blood and urine tests confirmed the presence of cannabis and benzodiazepine in Straub's system. Dr. Allen eventually released Straub to her mother.

### B. Straub Sues in Federal Court.

Straub sued Dr. Allen, St. Luke Hospital, its employees, Officer Kilgore, and the City of Wilder in federal district court under 42 U.S.C. § 1983, alleging that their actions violated Straub's federal constitutional rights and making various state common law tort claims. Following two years of discovery, the federal district court granted summary judgment in favor of all defendants on Straub's § 1983 claims and dismissed the common law tort claims without prejudice. In its order, the federal district court examined the merits of Straub's § 1983 claims and concluded that Officer Kilgore had probable cause to arrest Straub and that the hospital defendants had not acted under "color of law." Straub appealed, and the United States Court of Appeals for the Sixth Circuit affirmed the dismissal of Straub's § 1983 claims.

### C. Straub Sues in State Court.

Straub then brought this action in the state trial court against the defendants from the federal case and added more hospital employees as defendants. In the state action, she alleged violation of state constitutional rights in addition to asserting the same three common law claims that were dismissed in the federal suit: false imprisonment, false arrest, and the tort of outrage. Later, Straub amended her complaint to add another common law claim, assault and battery, which she had not asserted in the federal action.

The trial court granted summary judgment on the outrage claim in favor of all defendants and without objection from Straub.

The trial court also dismissed before trial Straub's claims that the hospital defendants acted under color of state law to deprive Straub of her due process interests under the Kentucky Constitution. The trial court agreed with the analysis reflected in the dismissal order of the federal district court and the affirming opinion of the federal appeals court that the facts failed to demonstrate that the hospital defendants acted as agents of the state when they gowned, restrained, catheterized, and drew blood from Straub. The trial court opined that those actions were based upon independent health care decisions initiated by the emergency room physician and not under the direction of Officer Kilgore.

Straub's false arrest claims against Officer Kilgore and the City of Wilder, along with her false imprisonment and assault and battery claims against Officer Kilgore and the hospital defendants proceeded to a jury trial. The jury returned a verdict for all the defendants, and the trial court entered judgment accordingly.

Both parties appealed to the Court of Appeals, which reversed the judgment and remanded the case to the trial court for additional proceedings.

## II. ANALYSIS.

### A. KRS 446.070 Does Not Provide Money Damages for Alleged Violations of the Kentucky Constitution.

Straub alleges the violation of her substantive due process interests found in §§ 1,[2] 2,[3] 10,[4] and 14[5] of the Bill of Rights

---

**2.** Protecting the rights of life, liberty, worship, pursuit of safety and happiness, free speech,

of the Kentucky Constitution. Borrowing a concept from federal civil rights litigation, she alleges liability on the part of the hospital defendants for actionable conduct "under color of state law." She argues that KRS 446.070 serves as the state's analogue to 42 U.S.C. § 1983 by establishing a statutory cause of action to allow recovery of money damages from those acting under color of state law who deprive a person of state constitutional rights.

The Court of Appeals reversed the trial court's issuance of summary judgment against Straub on these allegations, thereby recognizing these rights as actionable and finding the existence of factual disputes on the issue of whether the hospital defendants acted under color of law in depriving Straub of these rights.

But we find no cause of action for money damages existed for these rights under KRS 446.070, so we reverse the Court of Appeals on this issue. This holding renders moot the issue of whether the hospital defendants acted under color of state law.

### 1. Background of KRS 446.070.

KRS 446.070 provides, "A person injured by the violation of any statute may recover from the offender such damages as

he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."

█ The Kentucky General Assembly enacted this statute in 1942 to codify common law negligence per se.[6] In accord with traditional legal principles related to the common law concept of negligence per se, the statute applies when the alleged offender violates a statute and the plaintiff comes within the class of persons intended to be protected by the statute.[7] This statute "permits a person injured by the violation of a statute to recover damages by reason of the violation."[8]

█ Precedent acknowledges some restrictions on the applicability of KRS 446.070. The "any statute" language used applies to Kentucky statutes.[9] Our courts have considered the application of the statute to federal laws and regulations,[10] the laws of other states,[11] city or municipal ordinances,[12] and administrative regulations.[13]

█ Violations of federal laws and regulations and the laws of other states do not create a cause of action based on KRS 446.070.[14] Ordinances are held not to be

acquiring and protecting property, peaceable assembly, redress of grievances, and bearing arms.

3. Denying the exercise of absolute and arbitrary power.

4. Providing security for individuals from unreasonable search and seizure.

5. Stating a right of judicial remedy exists for injuries suffered by individuals and their lands, goods, or reputations.

6. *Davidson v. American Freightways, Inc.*, 25 S.W.3d 94 (Ky.2000).

7. *Id.* at 99–100.

8. *Allen v. Lovell's Adm'x*, 303 Ky. 238, 197 S.W.2d 424, 426 (1946).

9. *T & M Jewelry, Inc. v. Hicks ex rel. Hicks*, 189 S.W.3d 526 (Ky.2006) (*citing Baker v. White*, 251 Ky. 691, 65 S.W.2d 1022 (1933); *Alderman v. Bradley*, 957 S.W.2d 264 (Ky. App.1997)).

10. *T & M Jewelry, Inc.*, 189 S.W.3d 526.

11. *Id.*

12. *Alderman*, 957 S.W.2d 264.

13. *Centre College v. Trzop*, 127 S.W.3d 562 (Ky.2003).

14. "The Kentucky General Assembly did not intend for KRS 446.070 to embrace the whole of federal laws and the laws of other states and thereby confer a private civil remedy for

"statutes"; and, therefore, violation of an ordinance also fails to state a cause of action under KRS 446.070.[15]

■ Regarding administrative regulations, this Court previously stated, "All the cases supporting recovery for regulatory violations involve safety regulations adopted pursuant to the exact mandate of their enabling statute.... [I]t has been only in this specific context of public safety regulations that the Court has allowed KRS 446.070 to extend to violations of administrative regulations."[16] So KRS 446.070 creates a cause of action in narrow circumstances when an administrative regulation is at issue. The requirements are two-part: (1) the regulation must be consistent with the enabling legislation and (2) it must apply to the safety of the citizenry.[17]

## 2. In Relation to KRS 446.070, the Word "Statute" Will Not be Interpreted to Mean Constitution.

■ In 1933, our predecessor Court undertook to determine whether the violation of a municipal ordinance created a cause of action for a negligence per se claim.[18] In its holding, the Court stated:

In harmony with the foregoing rules of construction prescribed by the Legislature, this court has consistently held that, in the interpretation and construction of statutes, words and phrases employed by the lawmaking body must be

given their plain and ordinary meaning according to popular usage, unless they have acquired a technical sense, in which event, they will be given such accepted technical meaning.[19]

Based on the accepted rules of construction, the Court concluded the word *statute* could not be construed to mean *municipal ordinance* based on common usage and understanding.[20]

In the case before us, we encounter a similar analysis: can the word' *statute* be construed to mean *constitution* under KRS 446.070? We hold it cannot be so construed.

According to BLACK'S LAW DICTIONARY, a statute is "[a] law passed by a legislative body; [specifically], legislation enacted by any lawmaking body, including legislatures, administrative boards, and municipal courts."[21] At the outset, we note a distinction between this simple definition and the interpretation applied by the courts of the Commonwealth—under our law, a municipal ordinance is not considered a statute.

■ In *Baker v. White*,[22] the Court distinguished a municipal ordinance from a statute by referencing the manner in which the two regulations are enacted:

Applying either the general rule or the exception to the word "statute" [ ... ], it is apparent that it cannot be construed to include within its scope and meaning a municipal ordinance, since, according

---

such a vast array of violations." 189 S.W.3d 526, 530.

15. *Alderman v. Bradley*, 957 S.W.2d 264, 266 (*citing Baker v. White*, 251 Ky. 691, 65 S.W.2d 1022, 1024 (1933), concluding "that a municipal ordinance could not be construed to be included in the scope and meaning of the word 'statute.' ").

16. *Centre College*, 127 S.W.3d at 567.

17. *Id.*

18. *Baker*, 251 Ky. 691, 65 S.W.2d 1022 (1933).

19. *Id.* at 1024 (citations omitted).

20. *Id.*

21. BLACK'S LAW DICTIONARY (9th ed.2009).

22. 251 Ky. 691, 65 S.W.2d 1022 (1933).

to common usage and understanding, the former term applies to laws enacted by the supreme lawmaking body of the state, while the latter is commonly understood to mean an enactment of the council of a municipal corporation, a subdivision of the state, and applying solely to the government of such municipality; and, if classified as coming within the exception as a technical word or one that has acquired a peculiar meaning, the former does not [ . . . ] become any more comprehensive.[23]

Our common understanding is that the word *statute* means a law or regulation enacted by the legislative branch of government. Contrarily, a constitution commonly refers to something more expansive than a statute.

According to BLACK'S LAW DICTIONARY, a constitution is "[t]he fundamental and organic law of a nation or state that establishes the institutions and apparatus of government, defines the scope of governmental sovereign powers, and guarantees individual civil rights and civil liberties."[24] At its heart, a state constitution is "a framework for self-governance consisting of a set of written instructions issued by a sovereign people to their governmental agents."[25]

The current version of the Kentucky Constitution is the fourth constitution in the history of the Commonwealth.[26] Since the adoption of the current constitution in

1892, there have been seventy-eight attempts to amend our constitution, only forty of which have been successful.[27] Unlike a statute, which must pass through both bodies of our bicameral legislature and be signed by the governor to become effective, a constitutional convention requires the majority vote of both legislative chambers in two separate sessions and "one-fourth of the number of qualified voters who voted at the last preceding general election in [Kentucky]."[28] A constitutional amendment requires the citizens of Kentucky to vote for ratification or rejection.[29] In this sense, our constitution cannot be considered a statute. Although reforms or revisions may begin in our legislature, the Constitution "is not enacted by [the] legislature, but ratified by the populace of [the] state."[30]

Aligning with our own precedent, recognizing the common meanings of the words *statute* and *constitution*, and accepting the fundamental differences in their creations, we hold that KRS 446.070 does not create a private right of action for violations of the state constitution because our constitution is not a statute.

**B. We Decline to Create Judicially a New Constitutional Tort in Kentucky.**

■ Straub argues that even if we conclude that the General Assembly has failed to authorize a private right of action for

23. *Id.* at 1024.

24. BLACK'S LAW DICTIONARY (9th ed.2009).

25. James A. Gardner, *What Is a State Constitution?*, 24 Rutgers L.J. 1025 (Fifth Annual Issue on State Constitutional Law) (Summer 1993).

26. Legislative Research Commission, *The Constitution of the Commonwealth of Kentucky*, Informational Bulletin No. 59 (November 2010).

27. *Id.*

28. Ky. Const. § 258.

29. Ky. Const. § 256.

30. Gardner, *What Is a State Constitution?*, 24 Rutgers L.J. 1025, 1030 (Fifth Annual Issue on State Constitutional Law) (Summer 1993).

state constitutional violations through KRS 446.070, this Court should follow the lead of the United States Supreme Court in *Bivens v. Six Unknown Named Agents*[31] to create a new tort cause of action in Kentucky to provide money damages for constitutional violations. We decline Straub's invitation to exercise judicial authority in this fashion because we conclude that adequate alternative remedies exist, as evidenced by the fact that Straub's complaint alleged four alternative theories of recovery against all the defendants.

In *Bivens*, federal agents performed a search and seizure in violation of the Fourth Amendment;[32] and the Court held the plaintiff could bring suit to recover against the officers involved for violating his Fourth Amendment rights.[33] For several years following *Bivens*, the United States Supreme Court and many lower courts appeared to treat a *"Bivens* action" as similar to a 42 U.S.C. § 1983 action.[34] Recent decisions from the Supreme Court reflect a more narrow approach to permitting *Bivens* actions in a variety of circumstances:

> Since 1980 [ . . . ], the Supreme Court has refused to permit *Bivens*-style claims in numerous contexts, including First Amendment claims brought by

federal employees, injuries suffered by members of the military while in service, actions under the Due Process Clause for denial of Social Security benefits, claims brought against federal agencies, and claims brought against private corporations.[35]

*Wilkie v. Robbins*[36] illustrates the Supreme Court's present attitude toward *Bivens* actions. In *Wilkie*, the plaintiff alleged harassment and intimidation by officials of the Bureau of Land Management who attempted to acquire an easement across the plaintiff's private property.[37] In its decision, the Supreme Court stated, "[I]t is not an automatic entitlement no matter what other means there may be to vindicate a protected interest, and in most instances we have found a *Bivens* remedy unjustified."[38] The Supreme Court went on to outline the two-step inquiry required to determine whether a *Bivens* action is viable: (1) "whether any alternative, existing process for protecting the interest amounts to a convincing reason for the Judicial Branch to refrain from providing a new and free-standing remedy in damages"[39] and (2) whether special factors exist which counsel hesitation against implying a *Bivens*

---

31. 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (recognizing the right to recover damages for the violation of a constitutional right in an action against federal narcotics agents who had arrested the party without a warrant or probable cause, resulting in humiliation, embarrassment and mental anguish.).

32. *Id.* at 389, 91 S.Ct. 1999.

33. 403 U.S. at 397, 91 S.Ct. 1999.

34. Alexander A. Reinert, *Measuring the Success of Bivens Litigation and Its Consequences for the Individual Liability Model*, 62 Stan. L.Rev. 809, 822 (2010), (stating "[T]he Court recognized that there was a *Bivens* action

under the Due Process Clause for employment discrimination and that *Bivens* provided a remedy under the Eighth Amendment for prisoners alleged cruel and unusual punishment." (citations omitted)).

35. Reinert, *Measuring the Success of Bivens Litigation*, at 822–23 (citations omitted).

36. 551 U.S. 537, 127 S.Ct. 2588, 168 L.Ed.2d 389 (2007).

37. *Id.* at 541, 127 S.Ct. 2588.

38. 551 U.S. at 550, 127 S.Ct. 2588.

39. *Id.*

remedy from the Constitution.[40] In *Wilkie*, the Court found that the availability of alternative remedies did not support or negate a *Bivens* remedy but declined to recognize a new cause of action because "special factors" existed which counseled against the recognition of a new remedy—the case required excessive distinction drawing regarding government conduct.[41]

In the present matter, this opinion notes the availability of other remedies for the alleged violation of Straub's rights under the Kentucky Constitution—traditional tort actions. Based on the United States Supreme Court's narrowing acceptance of *Bivens* actions since 1980 and our application of the *Bivens* two-step inquiry to the facts before us, we reject Straub's alternative request to recognize a new tort cause of action under *Bivens*.[42]

## C. Evidentiary Issues.

### 1. The Trial Court Did Not Err When It Refused to Answer Jury Questions During Deliberations.

■ During deliberations, the jury submitted three questions to the trial court. The questions and the trial court's response were as follows:

Jury Question # 1: In Question # 2, can we the jury separate out the culpability of St. Luke versus the injury to Shannon Straub? That is, can we find fault with the defendant without believing that Ms. Straub has experienced any injury (*i.e.* psychological)?

Trial Court's Response: You are instructed to answer Question # 2 as presented.

Jury Question # 2: May we please have Shannon Straub's testimony or her deposition?

Trial Court's Response: You may not have either recorded testimony from trial or a deposition. You must rely on your collective recollections.

Jury Question # 3: Does "injury" that is listed with each question need to be lasting or temporary?

Trial Court's Response: Please reread and review the instruction[s] and rely on your collective judgments.

Straub's trial counsel requested that the trial court advise the jury that under Kentucky law, a temporary injury would be sufficient to support a jury verdict. Over objection by Straub's trial counsel, the trial court referred the jury to the instructions and to the jurors' "collective judgments."

The jury concluded that no defendant breached any duty owed to Straub that was a substantial factor in causing injury to her. When the foreperson delivered the verdict, he requested permission to read a statement from the jury. In relevant part, the message said:

---

40. *Id.* This reiteration of the first prong of the test has been considered by many scholars as strongly limiting the viability of a *Bivens* action. In *Bivens*, the Supreme Court originally considered "alternative remedies" to be those instance in which Congress provided an alternative remedy. After Supreme Court decisions in *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001), and *Wilkie*, *any* alternative process that contains a "convincing reason" to refrain from recognizing a new cause of action can preclude a *Bivens* action.

41. 551 U.S. at 555–61, 127 S.Ct. 2588.

42. We further note the United States Supreme Court takes a case-by-case approach to assessing whether or not a *Bivens* action is valid. In light of that approach, our decision in this matter regarding Straub's request for a *Bivens* remedy is confined to the facts of this case.

For the record, we the jury believe that St. Luke bears some of the responsibility for what happened to Shannon Straub. The jury would have been [unanimous] in voting "yes" for Question # 2 had it been phrased such that St. Luke [bore] responsibility regardless of [the] injury to Shannon Straub. The question, however, was written such that both parts had to be agreed to in order to render a "yes" response. This prompted us to ask our first question. Since we were directed to answer the question as written, 9 of us voted to say "no"....

Straub insists that the trial court erred by refusing to answer the jury's questions. And, by failing to do so, the trial court allowed the jury mistakenly to believe that a "temporary injury" was insufficient to support a verdict for Straub.

A majority of the Court of Appeals panel found reversible error in the trial court's refusal to answer jury questions during deliberations and stated, "[T]he court's refusal to answer the question exacerbated the jury's misunderstanding as to what was required for a finding of liability.... [W]e believe the only remedy to be a remand of this case to the trial court for a new trial...."

We disagree with the Court of Appeals majority, which relied on the decision in *Thompson v. Walker*[43] to support its finding of reversible error by the trial court. In *Thompson,* the appellate court found that the trial court might have alleviated juror confusion by answering questions posed by the jury because the instructions were erroneous and unclear on the issue of negligence.[44]

At the time the facts underlying the *Thompson* case occurred, KRS 29.304 controlled the manner of giving information on law or evidence after submission to the jury and permitted the court to comment on the law when the jury so requested.[45] In 1976, KRS 29A.320 superseded KRS 29.304. And KRS 29A.320 places no obligation on the trial court to explain its jury instructions. Our case law holds that no definition of a straightforward term is required in jury instructions.[46]

The trial court's instructions in the case at hand mirrored those suggested by PALMORE'S *INSTRUCTIONS FOR KENTUCKY JURIES.* The word *injury* is not defined by PALMORE. And there was no need for the word *injury* to be defined or explained by the trial court. The trial court's instruction posed this question to the jury:

> Do you find from the evidence that the Defendant, St. Luke Hospital, Inc., breached its duties set forth herein, and that said breach was a substantial factor in causing injury to Shannon Straub?

MERRIAM-WEBSTER defines the word *injury* as "an act that damages or hurts" or "hurt, damage, or loss sustained." The plain meaning of the word is clear. Trial counsel was presumably aware of the content of these instructions and the evidence produced at trial. Closing arguments were an appropriate vehicle to inform the jury that injury can be "lasting" or "temporary." A judicial elucidation of the word *injury* that exceeds the common, accepted definition of the word was not required.

The post-verdict statement read by the foreperson does not suggest jury confusion. On the contrary, reading the entire statement, one must logically conclude that

---

**43.** 565 S.W.2d 172 (Ky.App.1978).

**44.** *Id.* at 174.

**45.** 565 S.W.2d at 174.

**46.** *Commonwealth v. Hager,* 35 S.W.3d 377, 379 (Ky.App.2000).

the jurors actually performed their fact-finding duty appropriately:

> Specifically, we believe that St. Luke was at fault for poorly managing its records. While this may not contribute to any lasting injury to Shannon, a better documented paper trail would have aided them in demonstrating their commitment to proper patient care.... Essentially, a lack of documentation concerning that she was restrained and catheterized (including the rationale for this) should have been provided.
>
> Ultimately, *the majority of the jury could not be convinced that Ms. Straub experienced injury* based on the evidence presented. For this reason, the responses to questions 2–5 were split. (Emphasis added.)

Because the requisite number of jurors could not find an injury based on the evidence and because the trial court was under no obligation to expound on the ordinary meaning of the word *injury*, we find no error in the trial court's refusal to answer jury questions during deliberations.

### 2. The Trial Court Did Not Commit Reversible Error When It Allowed Evidence at Trial of Straub's Use of Profanity or Drugs.

At trial, a videotaped deposition of Straub's boyfriend was the only testimony presented that specifically contradicted Straub's evidence about the events leading up to the emergency room episode. Straub's boyfriend testified that she was under the influence of drugs or alcohol during the evening before she was taken to the emergency room, she has a history of drug use, and she uses profanity when agitated.

Straub argues that the evidence of her history of drug use and her habit of using profanity when frustrated was inadmissible and highly prejudicial. But we find no error in the trial court's admission of the testimony of Straub's boyfriend. And, if any error existed, it was harmless.

Evidence that makes a material fact more or less probable than it would be without the evidence is relevant evidence.[47] But that rule must be considered in tandem with the directive of Kentucky Rules of Evidence (KRE) 403, which permits the trial court to exclude otherwise relevant evidence if it is substantially more prejudicial than probative, confuses the issues, misleads the jury, causes undue delay, or results in the unnecessary accumulation of evidence.

The standard of review for evidentiary rulings is abuse of discretion.[48] "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."[49] And no evidentiary error may be grounds for reversal unless it affects the substantial rights of the parties.[50]

### a. Testimony regarding Straub's drug or alcohol use on the evening in question.

■ Straub testified at trial that she was not under the influence of drugs or alcohol on the night before Officer Kilgore transported her to St. Luke Hospital. But her boyfriend testified to the contrary, stating that Straub told him she was under the influence of both drugs and alcohol

**47.** *Commonwealth v. Mattingly,* 98 S.W.3d 865 (Ky.App.2002).

**48.** *Clark v. Commonwealth,* 223 S.W.3d 90, 95 (Ky.2007).

**49.** *Goodyear Tire and Rubber Company v. Thompson,* 11 S.W.3d 575, 581 (Ky.2000).

**50.** Kentucky Rules of Civil Procedure (CR) 61.01 and KRE 103.

when Officer Kilgore took her into custody. The Court of Appeals found this evidence admissible and stated:

> Certainly, the trial court could have found this particular testimony relevant.... [W]hether or not Straub was under the influence of any drug or alcohol on the evening of April 17, 1999, is a material issue in dispute, and directly relevant to the justification or lack thereof for the events that ultimately occurred.

We agree with the decision of the Court of Appeals on this evidentiary issue. The probative value of this evidence is not substantially outweighed by undue prejudice.[51]

### b.  Testimony regarding Straub's drug use and use of profanity.

■ The Court of Appeals found reversible error in the "testimony concerning Straub's past and subsequent drug usage." We disagree with the holding of the Court of Appeals on this issue.

Straub's trial lasted eight days, which included six days of testimony. During Straub's testimony, she denied consuming alcohol or marijuana on the day in question. But Straub admitted to smoking marijuana approximately a week before the incident and taking Valium about one to one and a half weeks before she was detained by Officer Kilgore. On cross-examination, the hospital defendants' counsel asked limited questions regarding Straub's drug use, which included a request to describe her drug use over the past eleven years. Straub stated she used marijuana occasionally but not very often. Straub's ex-boyfriend, Christopher Porter, provided testimony, which lasted approximately five minutes. During Porter's testimony, he stated that Straub told him she experimented with drugs as a young person. And Porter also testified that Straub used marijuana as often as once a day when they were a couple.

Information regarding Straub's prior drug use was initially solicited by her own counsel and questioned by counsel for the hospital defendants after the door was opened and in a limited manner. In the context of this trial in which the trial court placed restrictions on the hospital defendants' trial counsel, performed in-camera reviews of witness testimony, and Straub admitted her own occasional drug use, we do not find error in the admission of narrow testimony describing her past drug use.

■ As we read the decision of the Court of Appeals, it found the admission of testimony regarding Straub's use of profanity in the hospital was substantially more prejudicial than probative. But we disagree with the Court of Appeals because we are persuaded by the logic of the hospital defendants that they were "entitled to have the jury understand exactly what was observed when [Straub] was in the emergency room." Testimony indicated that Straub, on occasion, would erupt with profanity and hurl violent threats at hospital staff. Although no one testified to these outbursts being used in a diagnostic manner, the hospital defendants were entitled to present a complete clinical picture to the jury. We find no abuse of discretion in the trial court's decision to admit such testimony.

### D.  Remaining Issues.

In light of our decision that KRS 446.070 does not create a private cause of action for alleged violations of the state constitution and our decision to reinstate the judgment of the trial court, we do not need to reach a decision as to: (1) whether a one

---

51.  KRE 403.

year statute of limitations bars claims not raised in federal court, (2) whether Straub filed her state court action prematurely under KRS 413.270, and (3) whether a punitive damages instruction was permissible.[52]

### III. CONCLUSION.

For the foregoing reasons, we reverse the decision of the Court of Appeals and reinstate the judgment of the trial court.

All sitting. All concur.

---

52. The trial court gave an instruction on punitive damages, but the jury found no breach of duty on the part of any of the defendants. Therefore, Straub was not harmed in any way at the trial level by the deprivation of a punitive damages instruction.