RENDERED: OCTOBER 29, 2015
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2014-SC-000589-CL



IN RE:

NANCY J. MCCARTY; NANCY J. MCCARTY,
AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF DAVID W. MCCARTY,
DECEASED; AND LIBERTY MUTUAL
AGENCY MARKETS

|   |   |
|---|---|
| V. | THE UNITED STATES<br>COURT OF APPEALS FOR THE SIXTH CIRCUIT<br>NO. 13-6484/6499 |

COVOL FUELS NO. 2, LLC (A UTAH
CORPORATION)

### OPINION OF THE COURT BY JUSTICE VENTERS

### CERTIFYING THE LAW

The United States Court of Appeals for the Sixth Circuit certified to this
Court pursuant to CR 76.37(1) a question of Kentucky law. The certified
question is:

> **Whether a subcontractor injured while installing a garage door
> on an unfinished building at a mine site may maintain a
> wrongful death action against a mine operator under a
> negligence per se theory for alleged violations of Kentucky
> mining [statutes and] regulations, codified in KRS §§ 351-352
> and KAR §§ 805-825.**[1]

---

[1] While the certified question refers to "KAR §§ 805-825," which could be
interpreted as referring to KAR Sections 805 *through* 825, the intervening regulatory
titles (e.g., Department of Insurance (KAR § 806) and Department of Charitable
Gaming (KAR § 820)) bear no relationship at all to the issues we address. We construe
the certified question as referring only to KAR Sections 805 (ENERGY AND
ENVIRONMENT CABINET) and 825 (ENERGY AND ENVIRONMENT CABINET -
KENTUCKY MINE SAFETY REVIEW COMMISSION).

Based upon our review of the applicable Kentucky law and the facts relevant to this inquiry, and for the reasons set forth below, we conclude that KRS Chapters 350[2], 351 and 352 and Kentucky Administrative Regulations (KAR) Sections 805 and 825 do not support a wrongful death action predicated upon a theory of negligence per se in the factual context presented here.[3]

## I. FACTUAL BACKGROUND

Covol Fuels (Covol) operates a coal mine in Muhlenberg County, Kentucky. Covol contracted with H & B Builders for the construction of a post-frame structure at Covol's mine site. H & B subcontracted with Evansville Garage Doors for the installation of an 1,800-pound overhead, commercial-grade garage door for the building. David McCarty and Jeremy Means, employees of Evansville Garage Doors, were dispatched to the Covol mine site to install the heavy door. McCarty was highly skilled in this specialized aspect of the construction industry, having installed approximately 1,000 garage doors.

McCarty was killed during the installation of the door at the Covol site. At the time of the accident, he was standing on an unsecured stepladder checking the tension spring mechanism on the door, which was suspended directly over his head in the open position. Suddenly, the door descended and

---

[2] Although the certified question does not refer to KRS Chapter 350, the Estate argues for its application and so we include it in our consideration of the issue.

[3] We note at this point that our analysis is limited to claims based upon alleged violations of the identified statutes and regulations. We do not address the viability of any claims or potential claims based upon common law theories of premises liability because such claims are outside the scope of the certified question.

2

struck one of the rails of McCarty's stepladder. Under the weight of the door, the stepladder collapsed. McCarty was wearing a safety harness but it was not secured to anything so he fell, striking his head and suffering a fatal injury.

The Federal Mine Safety and Health Administration (MSHA) investigated the circumstances of McCarty's death because it occurred on property containing a coal mine. The MSHA inspector concluded that McCarty's fall resulted from the placement of the ladder directly below the door opening, coupled with the installers' failure to follow the manufacturer's installation instructions requiring that the door be blocked from motion so that it would not move during the installation process.

McCarty's widow, Nancy J. McCarty, Individually and as the Personal Representative of McCarty's Estate (collectively, the Estate) brought a wrongful death action against Covol alleging, among other things, that Covol was negligent per se for violating various coal mine safety statutes and regulations. After a period of discovery, Covol moved for summary judgment on all claims. The federal district court granted summary judgment. In its evaluation of the negligence per se claim, which is our only concern, the district court reasoned that at the time of the accident, McCarty was not within the class of persons protected by Kentucky's mine safety laws and that his accidental death did not occur under circumstances that our mine safety laws were intended to prevent.

The Estate appealed to the Sixth Circuit challenging, among other issues, the district court's rejection of its negligence per se theory. We subsequently granted the Sixth Circuit's request to certify the law in regards to whether the

3

statutes and regulations relied upon by the Estate were intended: 1) to protect employees of independent contractors, such as garage door installers who, like McCarty, were injured while working in the proximity of a mine site; and 2) to prevent the type of accident that caused McCarty's death.

## II. ANALYSIS

In 1942, the Kentucky General Assembly enacted KRS 446.070 to codify the common law principles of negligence per se. *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 534 (Ky. 2011). KRS 446.070 provides: "A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation."

We said in *Straub* that "in accord with traditional legal principles related to the common law concept of negligence per se, [KRS 446.070] applies when . . . the plaintiff comes within the class of persons intended to be protected by the statute [alleged to have been violated]." *Id.* Our case law also recognizes two other conditions which must be satisfied for the application of KRS 446.070. First, "[t]he statute must have been specifically intended to prevent the type of occurrence that took place." *Hargis v. Baize*, 168 S.W.3d 36, 46 (Ky. 2005). Second, "the violation [of the statute] must have been a substantial factor in causing the result." *Id.*

At this point, it must be noted that KRS 446.070 expressly references only causes of action for "person[s] injured by the violation of any statute." No reference is made in the statute to injuries that result from the violation of an

4

administrative regulation. *Straub* addresses that issue. When the violation of an administrative regulation is at issue, "KRS 446.070 creates a cause of action in [these] narrow circumstances . . . (1) the regulation must be consistent with the enabling legislation and (2) it must apply to the safety of the citizenry." *Straub*, 354 S.W.3d at 535 (citing *Centre College v. Trzop*, 127 S.W.3d 562, 567 (Ky. 2003)).

Furthermore, when a provision of the enabling statute for the promulgation of administrative regulations expressly mandates compliance with those regulations, the violation of the regulation is the equivalent of a violation of a statute, thereby bringing the regulation within the scope of KRS 446.070. *Hargis*, 168 S.W.3d at 41. With these fundamental principles in mind, we proceed to an examination of the statutes and regulations asserted by McCarty's estate and his widow to determine whether a negligence per se claim can be based upon those provisions.

## A. KRS Chapters 351 and 352

We first consider the statutory provisions identified as applicable to the Estate's negligence per se claims. The certified question generally refers to KRS Chapters 351 and 352; the Estate specifically cites KRS 352.280, KRS 352.330, and KRS 352.340.

KRS Chapter 351 is titled "DEPARTMENT OF NATURAL RESOURCES" and sets forth a multitude of statutory provisions applicable to the organization, duties, and operations of that agency, which is the principal agency overseeing mining operations in the Commonwealth. KRS 351.020 (the

Department of Natural Resources "shall administer all laws of the Commonwealth relating to mines."). KRS 351.010(q) defines a "mine" as:

> any open pit or any underground workings from which coal is produced for sale, exchange, or commercial use, and all shafts, slopes, drifts, or inclines leading thereto, *and includes all buildings and equipment,* above or below the surface of the ground, *used in connection with the workings.* Workings that are adjacent to each other and under the same management, but which are administered as distinct units, shall be considered a separate mine[.]

(emphasis added).

Central to the Estate's argument is the assertion that McCarty's fatal injury occurred at a "mine" because the garage door installation was being performed at a building situated on a coal mine site. However, as emphasized above in the statutory text, the only "buildings" that fall within the definition of a "mine" are those being "used in connection with the workings [of the mine]." As premised in the certified question itself, the structure upon which McCarty was working was an "unfinished building." Apparently, at the time of the accident, the building was under construction and was not being "used in connection with the workings" of Covol's mining operations. Similarly, the stepladder, harness, tools, and other equipment associated with the garage door installation would not qualify as "equipment" within this statutory definition because they were not being "used in connection with the workings" of a "mine."

The Estate's invocation of KRS Chapter 351 is tenuous because the Department of Natural Resources is tasked only with administrating coal mining laws. The installation of a garage door on an unfinished building, even

6

though situated in proximity to a coal mine, lies outside the scope of KRS Chapter 351 and the Department's bailiwick.

The criteria identified in *Straub* and *Hargis* for determining the applicability of KRS 446.070 requires an assessment of the legislative intent behind the statute: was the injured person among the class of individuals intended to be protected by the statute, and was the occurrence of the kind that the statute was designed to prevent? KRS 351.101, titled "Declaration of legislative finding of fact," and KRS 351.241, titled "Statement of General Assembly," provide critical insight into the legislative considerations underpinning KRS Chapter 351. KRS 351.101 provides:

The General Assembly hereby finds and declares the following:

(1) The highest priority and concern of the Commonwealth must be the health and safety of the **coal industry's** most valuable resource, **the miner**.
(2) The continued prosperity of the **coal industry** is of primary importance to the state.
(3) A high priority must be given to increasing the productivity and competitiveness of the **mines** in this state.
(4) An inordinate number of **miners** are killed or injured during the first few months of their experience in a **mine** and upon acquiring new work assignments in a mine.
(5) These injuries result in the loss of life and serious injury to **miners** and are an impediment to the future growth of the state's **coal industry**.
(6) **Mining is a technical occupation** with various specialties requiring individualized training and education.
(7) Injuries can be reduced through proper **miner** training, education, and certification.
(8) **Mine** safety can be improved by the imposition and enforcement of sanctions against licensed premises and certified and noncertified personnel whose willful and repeated violations of **mine** safety laws place **miners in imminent danger** of serious injury or death.
(9) Abuse of illicit substances and alcohol in the **mining industry** represents a serious threat to the health and **safety of all miners**.

7

Substance and alcohol abuse adversely affect the health and **safety of miners**. Mine safety can be significantly improved by establishing as a condition of certification that **miners** remain drug and alcohol free.

(emphasis added).

Similarly, KRS 351.241 provides:

The General Assembly hereby finds and declares the following:

(1) Thousands of Kentuckians **enter underground mines** each day **to produce coal** that is so vital to the economy of our nation and the well-being of its people.

(2) The **underground coal mine is a hazardous environment** that constantly requires the highest degree of safety consciousness on the part of every individual.

(3) Despite training and a variety of safety efforts, each year coal mines continue to take a heavy human toll: large numbers of **miners are injured**; many are left permanently disabled; and a **lesser number pay the ultimate price--death**.

(4) Many activities are performed by a variety of persons; therefore, each **coal miner** is expected to learn and perform a large number of tasks.

(5) **Miners** frequently become engaged in unfamiliar tasks when substituting for others or assisting a fellow worker.

(6) The American zeal for work and productivity very frequently causes the **miner** to give second priority to normal safety measures and precautions.

(7) Studies have demonstrated that experienced persons observing and providing on-the-job counseling to individual **miners** regarding their work habits can bring about a significant reduction in underground mine accidents and fatalities.

(emphasis added).

These statutory provisions are dominated by references to miners and the dangers miners confront while performing their jobs. In light of this emphasis, these provisions signal that the class of persons the legislature intended to protect by the statutory framework of KRS Chapter 351 is the traditional coal miner and others associated with the process of extracting coal

8

who also are routinely exposed to the unique dangers and risks inherent to coal mining. For the same reason, the dangers that these statutes purport to address are the occupational hazards traditionally associated with mining coal and working in a coal mining environment.

The Estate does not direct our attention to any specific provision from KRS Chapter 351 in support of its negligence per se claim. We are unable to identify any provisions within that chapter that impose upon coal mine operators a special duty of care owed to independent contractors and craftsmen who enter upon the premises to perform work unrelated to coal mining. Of course, the traditional common law duty of a landholder to make the property reasonably safe and to warn of unknown or latent dangers remains applicable, *see Lewis v. B & R Corporation*, 56 S.W.3d 432, 437-38 (Ky. App. 2001), but that duty is outside the scope of the question we address. Accordingly, we are constrained to conclude that the statutory text does not support the theory that KRS Chapter 351 imposes statutory duties upon Covol, the violation of which would support a negligence per se claim under KRS 446.070.

The certified question and the Estate's pleadings also refer to KRS Chapter 352, which is styled: "MINING REGULATIONS." Chapter 352 sets forth a host of provisions relating to mining operations, including certain safety provisions aimed at reducing the dangers inherent to the coal mining environment. Among the statutory subtitles contained in KRS Chapter 352 are the following representative examples:

9

- 352.020 Mine ventilation plans — Methods of ventilation — Amount of air required — Plan requirements.

- 352.090 Abandoned parts of mine to be posted — Sealing.

- 352.110 Mines to have two openings — Exception — Condemnation of land for opening.

- 352.140 Operation of cages and cars.

- 352.161 Examination of conveyor belts.

- 352.220 Electricity in mines and surface installations.

- 352.241 Explosives and blasting devices in mines.

- 352.300 Stations for fire bosses — Persons not to pass or remove danger signals.

- 352.550 Coercion of trade of miners prohibited.

A fair reading of KRS Chapter 352 in its entirety, as illustrated by the above examples, fails to confirm the Estate's theory that the Chapter intended to create duties owed by a coal mine operator to specialized workers whose labor and injury are associated with coal mining only by the fortuitous circumstance that they happen to take place on land occupied by a mining operation. The Estate cites three provisions of KRS Chapter 352 in support of its claim, which may be fairly abridged as follows:

1. KRS 352.280 - Examination of mine by properly certified person — Duties — Frequency of examinations.

> (1) In all **mines** the licensee, **mine** manager, or superintendent shall employ one (1) or more properly certified persons.
> (2) **A properly certified person shall examine carefully, within three (3) hours before each shift enters the mine:**
>> (a) Every working place;
>> (b) All places adjacent to live workings;
>> (c) Every roadway where persons are required to work or travel;

10

(d) All abandoned panels on the intake;

(e) Every set of seals on the intake; and

(f) All roof falls near active workings on the intake and on the working sections.

(3) Before proceeding with the examination he shall see that **the air current** is traveling its proper course.

(4) A properly certified person shall use approved **gas detection devices** in the performance of the required examination and shall examine the entrances to all worked-out and abandoned portions adjacent to the intake roadways and working places under his charge where explosive gas is likely to accumulate.

. . . . .          . . . . .          . . . . .

(6) If an **explosive mixture of gas** is discovered, the properly certified person shall place a danger signal across the entrance to every place where explosive gas is discovered or where immediate danger is found to exist from any other cause. The signal shall be sufficient warning to ensure that persons do not enter the area.

(7) When the **mine is idle** and workmen are required to **go into the mine**, the section, portion, or part of the mine entered must be inspected by a properly certified person within three (3) hours before the workmen enter.

(8) Each week, a properly certified person designated by the **mine** foreman shall examine each set of **seals on the return, all designated intake and return entries, and all escapeways**. (emphasis added).

2. KRS 352.330 - General duties of mine foreman -- Duty of licensee.

The **mine** foreman shall **exercise general supervision** over the **ventilating apparatus and the airways, traveling ways, working places, pumps and drainage**, and shall see that as the **miners advance their excavations** proper breakthroughs are made as required by law to properly ventilate the mine. He shall see that employees are provided with **sufficient props, cap pieces, and timbers** of suitable size, which shall be delivered to the working place and shall see that the props are cut as square as practicable at both ends and as near as practicable to the proper length required or designated for the places where they are to be used. The mine foreman shall see that the **water is drained** as nearly as practicable out of the working places, and that the working places are kept as free from water as practicable during working hours. **He shall see that every person employed to work in the mine is, before beginning to work, instructed in the particular danger incident to his work in the mine and furnished a copy of the rules of the mine** . . . . (emphasis added).

11

3. KRS 352.040 - Examination of mine by mine foreman or assistants — Removal of dangers — Record.

> (1) The **mine** foreman or his assistants **shall visit and carefully examine each working place in the mine at least every four (4) hours while the mine employees are at work**. He shall examine as live workings, on regular inspections, all places in live sections that are temporarily abandoned. . . . He shall see that every **mine liberating explosive gas** is kept free of standing gas in all working places and roadways, and that all accumulations of explosive or noxious gases in the worked-out or abandoned portions of any mine are removed as soon as possible after discovery. He shall ensure that all preshift examinations are conducted by a certified person and that **examinations of conveyor belts** have been conducted. He shall not allow any person who may be endangered by the presence of **explosive or noxious gases** to enter that portion of the mine until the gases have been removed. He shall direct and see that all dangerous places and the entrances to worked-out and **abandoned places in all mines** are properly barricaded across the openings, so that no person will enter, and that danger signs are posted upon the barricade to warn persons of existing danger . . . .
> (2) The **mine** foreman or his assistants, fire bosses, or other certified persons shall, at least once every week, travel and **examine all air courses, escapeways, the caches of self-contained self-rescuer devices** required by KRS 352.133, the caches' contents, seals on the return, roads, and openings that give access **to old workings or pillar falls** . . . .
> (3) **Examinations of conveyor belts** shall be conducted by a certified foreman or a certified belt examiner . . . . (emphasis added).

The Estate posits that the duties created in these statutory provisions, including the requirements for periodic inspections set forth in KRS 352.280 and KRS 352.040, apply equally to workers engaged in the mining operation and to specialized independent contractors such as McCarty, who happen to be upon the property. We respectfully reject this interpretation.

In the context of the statutory language, and construing the cited chapters as a unified statutory scheme, it is manifestly clear that the legislative

12

intent in enacting these provisions was to target and ensure the safety of the actual coal mining operations for the protection of the traditional coal miners and the mining technicians and engineers, mechanics, maintenance personnel workers, and other ancillary workers exposed to dangers of the mining environment. Nothing in the statutory text tasks the mine operator with tending to the safety of non-mining craftsmen and technicians and protecting them from the hazards of their own non-mining occupations.

Given the extensive statutory emphasis on the dangers of mining, we regard it as highly improbable that the General Assembly intended to burden coal mine inspectors and supervisors with the duty to become versed in the safety requirements of such extraneous activities as installing massive garage doors and other processes unique to the business of erecting buildings and foreign to the process of extracting coal. The mine operator's unfamiliarity with the special techniques, requirements, and hazards of the various construction trades is certainly a major reason for using specialized outside contractors instead of in-house laborers. Expecting the mine operator to provide safety inspections for the unfamiliar work of specialized independent contractors would divert resources away from the safety of workers actually engaged in mining coal, thereby increasing the very risks that the statute is designed to reduce.

From our review of KRS Chapters 351 and 352 in their entirety and in context, we conclude that Mr. McCarty was not "within the class of persons intended to be protected by the statute" as required for the application of KRS

13

446.070 and the principles of negligence per se, as set forth in *Straub*. We also conclude that the occurrence identified as the cause of McCarty's tragic death—the failure to secure the garage door in accordance with the manufacturer's installation instructions, and its subsequent fall—is not the type of occurrence that the foregoing mining statutes were intended to prevent. Consequently, the Estate's claims cannot be based upon a negligence per se theory predicated upon violations of KRS Chapters 351 and 352.

## B. Administrative Regulations

The Estates relies upon three regulations in support of its negligence per se claim under KRS 466.070: 805 KAR 7:090; 805 KAR 3:020; and 805 KAR 3:100. "KRS 446.070 creates a cause of action in [these] narrow circumstances . . . (1) the regulation must be consistent with the enabling legislation and (2) it must apply to the safety of the citizenry." *Straub*, 354 S.W.3d at 535 (citation omitted).

There being no statutory text within the enabling statutes (KRS Chapters 351 and 352) which would support a negligence per se theory of liability for the occurrence that injured McCarty, nor any precise mandate within the enabling statutes for the promulgation of regulations that would include the circumstances of this case, based upon the *Straub* rule alone, it would appear that the administrative regulations cited by the Estate would, likewise, fail to support a negligence per se claim. It would make little sense for the legislature to enact statutory provisions limited exclusively to the reduction or elimination of hazards associated with the mining of coal, and yet at the same time have

those same statutes serve as enabling legislation for administrative regulations focused upon occupational hazards far removed from the mining of coal so as to reach the hazards associated with installing large, commercial garage doors. Our resolution of the statutory issues in the preceding section should, by the same force of reasoning, resolve the Estate's arguments relating to the administrative regulations.

The Estate relies heavily upon the mine visitor provisions of Section (1) of 805 KAR 7:090, a regulation concerned with "Surface Hazard Training." That section provides that "[s]urface hazard training shall be provided by the [mine operator] to visitors exposed to mine surface hazards[.]" Manifestly, a "mine surface hazard" does not encompass the installation of a garage door on a building under construction. To the extent that the garage door posed a hazard during its installation, it was not a "mine" hazard. The enabling statutes for this regulation are KRS 351.106, KRS 352.350, KRS 351.070, and KRS 351.105, and yet an examination of those statutes does not disclose any indication that this regulation could have been intended to bear the weight advocated by the Estate.

805 KAR 3:020 concerns the establishment of "general operating safety standards controlling the operation of the Commonwealth's surface coal and clay mines, which include strip and auger mining operations." Neither the text of the regulation nor the text of the enabling statutes, KRS 13A.100, and KRS 351.070, encompasses the installation of a garage door during the construction of a building on the mining premises.

15

Similarly, 805 KAR 3:100 concerns "safety standards controlling the use and operation of equipment in the Commonwealth's surface type coal and clay mines, which include strip and auger mining operations." More specifically, the regulation addresses "exposed moving machine parts that may cause injury to persons," and power tools and machinery such as grinders, hand-held power tools, fork lifts, trucks, front-end loaders, bulldozers, and excavators, etc. This regulation is clearly geared toward addressing the safety of tools and equipment routinely used in the excavation of coal or clay. It does not encompass the instrumentalities of McCarty's accident.

None of the enabling statutes for the above-mentioned regulations contain language that would support the promulgation of regulations creating a duty owed by Covol to Mr. McCarty or the work in which he was engaged at the time of his accident. Any administrative regulation purporting to reach that hazard would fail as exceeding the scope of its enabling statute. *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529 (Ky. 2011).

In summary, the administrative regulations cited by the Estate apply to mining operations, mine workers and the traditional dangers and risks ordinarily associated with coal mining. We find nothing in the text of these administrative regulations which would indicate that McCarty was within the class of persons to be protected, or that his injuries were within the type of harms to be prevented by the regulations. We have examined the additional range of regulations cited in the certified question (Sections 805 and 825), and

16

are unable to locate any provision which would change the result of our discussion as set forth herein.

## C. KRS 350.020

Although KRS Chapter 350 (titled "Surface Coal Mining) is not specifically included within the Sixth Circuit's certified question, the Estate cites KRS 350.020, which identifies the following hazards and dangers of "unregulated surface coal mining operations:"

> soil erosion, damage from rolling stones and overburden, landslides, stream pollution, the accumulation of stagnant water and the seepage of contaminated water, increase the likelihood of floods, destroy the value of land for agricultural purposes, destroy aesthetic values, counteract efforts for the conservation of soil, water and other natural resources, destroy or impair the property rights of citizens, create fire hazards, and *in general create hazards dangerous to life and property, so as to constitute an imminent and inordinate peril to the welfare of the Commonwealth.* The General Assembly further finds that lands that have been subjected to surface coal mining operations and have not been reclaimed and rehabilitated in accordance with modern standards constitute the aforementioned perils to the welfare of the Commonwealth.

(emphasis added). The statute further provides that the General Assembly's purpose for the statute is "to minimize or prevent the injurious effects [of unregulated surface coal mining] on the people and resources of the Commonwealth."

The Estate maintains that the statute's reference to mining activities that "in general create hazards dangerous to life and property" encompasses the installation of garage doors at a coal mining site. We are persuaded otherwise.

The doctrine of *ejusdem generis* refutes the Estate's argument. *Ejusdem generis* is a rule of statutory construction that provides "where, in a statute,

17

general words follow or precede a designation of particular subjects or classes of persons, the meaning of the general words ordinarily will be presumed to be restricted by the particular designation, and to include only things or persons of the same kind, class, or nature as those specifically enumerated, unless there is a clear manifestation of a contrary purpose." *Kentucky Retirement Systems v. Brown*, 336 S.W.3d 8, 16 (Ky. 2011) (quoting *Steinfeld v. Jefferson County Fiscal Court*, 229 S.W.2d 319, 320 (Ky. 1950)).

All of the particular hazards identified in the statute—water contamination, blasting, dust issues, disposal of by-products, damage to vegetation, and reclamation concerns—have a direct nexus to the environmental consequences of "unregulated surface mining." The final provision referring generally to "hazards dangerous to life and property" relates to hazards that, likewise, have a direct nexus with the environmental hazards of surface mining. The fortuitous installation of a heavy garage door on a coal mining site has no nexus with unregulated coal mining, and is therefore, not among the hazards addressed by KRS Chapter 350.

## D. *Hargis v. Baize*, 168 S.W.3d 36 (Ky. 2005)

The Estate cites *Hargis v. Baize* as support for its claim that administrative regulations promulgated to effect the safety of employees in a regulated workplace from industrial hazards also protects independent contractors exposed to those hazards. On the strength of *Hargis*, the Estate argues that as an independent contractor, McCarty, like the decedent in *Hargis*, was entitled to the protections afforded by the administrative

18

regulations governing the particular regulated industry, and so the Estate is thereby entitled to assert a negligence per se claim based upon the violation of those regulations. However, the instant case is clearly distinguished by its facts. In *Hargis*, the deceased contractor, was engaged in the type of work—hauling and unloading logs at a saw mill—that was a core function of the regulated business, whereas the installation of garage doors is entirely unrelated to Covol's core business. Unlike the circumstances we address here, the regulations relied upon by the plaintiff in *Hargis* specifically applied to the type of work at issue. We are convinced that *Hargis* does not support a claim based upon negligence per se in this case.

### III. CONCLUSION

Based upon the foregoing analysis, we conclude in response to the request of the United States Court of Appeals for the Sixth Circuit, that a subcontractor injured while installing a garage door on an unfinished building at a mine site may not maintain a wrongful death action against a mine operator under a negligence per se theory for alleged violations of the Kentucky mining statutes and regulations codified in KRS Chapters 350, 351 and 352 and KAR Sections 805 and 825.

The law is so certified.

All sitting. All concur.

19

COUNSEL FOR NANCY J. MCCARTY AND NANCY J. MCCARTY, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF DAVID W. MCCARTY, DECEASED:

Travis Leon Holtrey
Foreman Watson Holtrey, LLP

Lane C. Siesky
Siesky Viche, PC


COUNSEL FOR LIBERTY MUTUAL AGENCY MARKETS:

Mark Wayne Howard
Jones Howard Law PLLC


COUNSEL FOR COVOL FUELS NO. 2, LLC, A UTAH CORPORATION:

Robert E. Stopher
Robert Dmitri Bobrow
Boehl, Stopher & Graves, LLP


COUNSEL FOR AMICUS CURIAE
KENTUCKY JUSTICE ASSOCIATION:

Paul A. Casi, II
Jeffrey Wayne Adamson
Paul A. Casi, II, P.S.C.

Kevin Crosby Burke