T & M JEWELRY, INC. d/b/a the Castle, et al., Appellants,

v.

JENNIFER HICKS By and Through Her Parents and Next Friends, Linda HICKS and Doug Hicks, et al., Appellees.

Jennifer Hicks By and Through Her Parents and Next Friends, Linda Hicks and Doug Hicks, et al., Appellants,

v.

T & M Jewelry, Inc. d/b/a the Castle, et al., Appellees.

No. 2003–SC–000665–DG, 2004–SC–000797–DG.

Supreme Court of Kentucky.

April 20, 2006.

Barry Miller, James D. Ishmael, Jr., Fowler, Measle & Bell, LLP, Lexington, Counsel for Appellants/Cross–Appellees.

Robert L. Elliott, Joe C. Savage, Escum L. Moore, III, Savage, Elliott, Houlihan, Moore, Mullins & Erdmann, LLP, Lexington, Counsel for Appellees/Cross Appellants.

## OPINION OF THE COURT

Eighteen-year-old Scott Greer shot his girlfriend, Jennifer Hicks, in the face with a pistol he had recently purchased from the Appellants, T & M Jewelry, Inc. d/b/a The Castle and Carol's Sporting Good, Inc., owned by Carol Harlin (collectively "The Castle"). Scott testified that he believed the gun to be unloaded and was playfully trying to scare Jennifer when he pulled the trigger. Scott thought that Jennifer "looked ·cute when she was scared." Jennifer and her parents (collectively "The Hickses") filed suit against The Castle, which in turn joined Scott as a third-party defendant. The Hickses alleged that The. Castle was negligent in selling a handgun to Scott, a person under the age of twenty-one, in violation of federal law. Both negligence per se and common-law negligence claims were asserted against The Castle.

Initially, the trial court granted summary judgment in favor of The Castle on the negligence per se claim but determined to allow the common-law negligence claim to proceed. Subsequently, however, the trial court also granted summary judgment in favor of The Castle on the common-law claim, concluding that The Castle had no duty under Kentucky law to refrain from selling a handgun to an adult under the age of twenty-one and, even if there was such a duty, Scott's actions constituted a superseding cause which absolved The Castle of any liability.

The Court of Appeals agreed that summary judgment was appropriate on the

negligence per se claim, but reversed the summary judgment on the common-law negligence claim. Both parties appealed and this Court granted discretionary review.

The Castle argues that the Court of Appeals should be reversed on the common-law negligence issue and that the trial court's summary judgment on both claims should be reinstated. The Hickses argue that the Court of Appeals' decision to allow the common-law negligence action to proceed should stand and that we should reverse the Court of Appeals' affirmance of the trial court's summary judgment on negligence per se, allowing both claims to proceed. Thus, the propriety of summary judgment on the negligence per se claim and the common-law negligence claim are properly before this court.

■■■ Summary judgment is appropriate only if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. We have held that to prevail, a movant must show that it appears impossible for the opposing party to succeed on its claim or defense.[1] A reviewing court must consider the record in the light most favorable to the party against whom the summary judgment was granted.[2]

Scott and Jennifer went to The Castle on July 18, 1996 and viewed its selection of handguns. Both Scott and Jennifer testified that Scott explicitly asked a Castle employee how old he had to be to purchase a handgun and the employee answered "eighteen." Furthermore, Jennifer testified that the employee told Scott that although the minimum age to purchase somewhere else, for example Wal–Mart, was twenty-one, a purchaser at The Castle

only needed to be eighteen. Scott selected a Jennings .22–caliber semi-automatic pistol and filled out the required paperwork. He provided The Castle with a valid driver's license that revealed his date of birth to be October 15, 1977, making him eighteen years old at that time. Seven days later, Scott returned to The Castle and took possession of the pistol he had purchased. He filled out more paperwork that, again, demonstrated that he was only eighteen years old. The very next day Scott, behaving playfully and believing the pistol to be unloaded, shot Jennifer in the face.

Carol Harlin, the owner and operator of The Castle testified that all employees, including the employee who made the sale to Scott, had been trained not to sell a handgun to a person younger than twenty-one. She admitted that The Castle should not have sold the pistol to Scott.

■■■ The relevant provision of The Gun Control Act of 1968 is 18 U.S.C. § 922(b)(1) which states in pertinent part:

It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, (under this chapter) or licensed collector to sell or deliver any firearm . . . to any individual who the licensee knows or has reasonable cause to believe is less than eighteen years of age, and, if the firearm . . . is other than a shotgun or rifle . . . to any individual who the licensee knows or has reasonable cause to believe is less than twenty-one years of age[.]

The Castle violated this statute. However, both the trial court and the Court of Appeals agreed that The Hickses had not stated a claim for negligence per se and

---

**1.** *Steelvest Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476 (Ky.1991); *Paintsville Hospital Co. v. Rose*, 683 S.W.2d 255 (Ky. 1985).

**2.** *Id.*

we, too, must agree. Although the Act imposes criminal penalties for violations of this statute, it does not explicitly provide a civil remedy. Recognizing that neither the presence of a criminal penalty nor the absence of an express civil remedy is dispositive of the availability of a civil remedy under the federal statute, we must determine whether the statute implicitly provides a private civil remedy.[3] The United States Supreme Court has delineated four factors necessary to this determination.[4] The first factor is whether the plaintiff is "one of the class for whose especial benefit the statute was enacted."[5] The second factor focuses on legislative intent and requires a determination of whether there is any indication, explicit or implicit, that Congress intended to create or deny a private civil remedy. The third inquiry is whether implying a private remedy for the plaintiff is consistent with the underlying purposes of the legislative scheme. The fourth and final factor is whether it would be inappropriate to infer a private cause of action based solely on federal law because the cause of action is one traditionally relegated to state law.[6]

In *Alderman v. Bradley,*[7] the Court of Appeals of Kentucky reviewed decisions in other jurisdictions addressing the issue. The Court of Appeals cited with approval the following language from *Decker v. Gibson Products Co. of Albany, Inc.:*[8]

> There is no indication in the legislative history of § 922 which suggests a congressional intention to vest in those victims injured by firearms obtained in a violation of § 922 a federal right to damages. A careful reading of the legislative history suggests that Congress intended the section to thwart the unlawful disposition of firearms at its inception rather than provide retrospective, remedial relief. This is evidenced by the legislative history's emphasis on increased law enforcement assistance and by the desire of Congress to afford relief to the Nation, rather than its injured victims.[9]

Significantly, however, the Eleventh Circuit reversed the U.S. District Court's grant of summary judgment in the above-quoted case.[10] Although the Eleventh Circuit agreed that the Gun Control Act provided no *federal* right to damages, it held that the plaintiffs had a right to have a

---

**3.** *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975); *Wyandotte Transportation Co. v. United States,* 389 U.S. 191, 88 S.Ct. 379, 19 L.Ed.2d 407 (1967).

**4.** *Cort,* 422 U.S. 66, 95 S.Ct. 2080; *Thompson v. Thompson,* 484 U.S. 174, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988). *But see Transamerica Mortgage Advisors, Inc., v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross Co. v. Redington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (There is some confusion regarding the weight that is to be given to each of the *Cort* factors. Specifically, the United States Supreme Court has reaffirmed its adherence to these factors in dicta, despite two post-*Cort* decisions which elevate the second factor, labeling it "determinative," while utilizing the other three factors simply as an aid for deciding the second factor. This inconsistency is pointed out in the concurring

opinion in *Thompson, supra,* at 188–91, 108 S.Ct. 513 (Scalia, J., concurring)).

**5.** *Cort,* 422 U.S. at 78, 95 S.Ct. 2080 (quoting *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916)).

**6.** *Cort,* 422 U.S. 66, 95 S.Ct. 2080.

**7.** 957 S.W.2d 264 (Ky.App.1997).

**8.** 505 F.Supp. 34 (M.D.Ga.1980), rev'd on other grounds by *Decker v. Gibson Products Co. of Albany, Inc.,* 679 F.2d 212 (11 Cir. 1982).

**9.** *Alderman,* 957 S.W.2d at 268 (quoting *Decker,* 505 F.Supp. at 36).

**10.** *Decker,* 679 F.2d 212.

jury determine whether the defendants' sale of a handgun to the particular person in that case was reasonable in light of the federal statute and under all the circumstances surrounding the transaction. The Eleventh Circuit also directed the U.S. District Court to evaluate whether violation of the Act constituted negligence per se under Georgia law.[11] While some other jurisdictions have allowed violations of the federal statute to be admitted as evidence of negligence,[12] we have discovered no case that holds that Congress intended to provide a federal right to damages under this statute. On the other hand, a provision of the recently enacted Protection of Lawful Commerce in Arms Act,[13] 15 U.S.C.A. § 7903(5)(a) would seem to undermine previous views of congressional intent. The protections of the new act expressly do not apply to actions brought against sellers for negligence per se or actions brought against sellers who knowingly violated a state or federal statute applicable to the sale.

Turning to state law, the Hickses contend that The Castle's violation constitutes negligence per se. KRS 446.070 codifies the doctrine of negligence per se in Kentucky.[14] It provides:

> A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation.

While the language of this statute does not expressly limit its reach to state statutes, numerous provisions in KRS Chapter 446 refer to "the statute laws of this state," and also repeatedly refer to acts or intent of "the General Assembly."[15] Thus "any statute" in KRS 446.070 has been held to be limited to Kentucky statutes and not to federal statutes or local ordinances.[16] The Kentucky General Assembly did not intend for KRS 446.070 to embrace the whole of federal laws and the laws of other states and thereby confer a private civil remedy for such a vast array of violations. On the other hand, we should not ignore The Gun Control Act of 1968, supra, and the Protection of Lawful Commerce in Arms Act, supra. Thus, we must decide what effect these statutes have on the Kentucky common-law civil liability of federally licensed gun dealers operating in Kentucky. Accordingly, we now turn to The Hickses' negligence claim.

To recover on a common law negligence claim in Kentucky, there must be a duty on the defendant's part, a breach of that duty, and consequent injury.[17] In general, this Court has adopted a "universal duty of care" which requires every person to exercise ordinary care in his activities to prevent foreseeable injury.[18] Ordinary care is the same degree of care as a prudent person engaged in a similar or like business would exercise under the circumstances.

---

11. *Id.*

12. *See, e.g., Decker,* 679 F.2d 212; *Lipari v. Sears, Roebuck & Co.,* 497 F.Supp. 185 (D.Neb.1980).

13. 15 U.S.C.A § 7901 et seq.

14. *Davidson v. American Freightways, Inc.,* 25 S.W.3d 94 (Ky.2000).

15. KRS 446.010 et. seq.

16. *See Baker v. White,* 251 Ky. 691, 65 S.W.2d 1022 (1933); *Alderman,* 957 S.W.2d 264.

17. *Mullins v. Commonwealth Life Ins. Co.,* 839 S.W.2d 245 (Ky.1992).

18. *Grayson Fraternal Order of Eagles, Aerie No. 3738, Inc. v. Claywell,* 736 S.W.2d 328 (Ky.1987).

We have recognized, of course, that the "universal duty of care" is not boundless. "The examination must be focused so as to determine whether a duty is owed, and consideration must be given to public policy, statutory and common law theories in order to determine whether a duty existed in a particular situation."[19] Consideration must also be given to whether the harm to the plaintiff resulting form the defendant's negligence was foreseeable.[20] In deciding whether harm was foreseeable, Kentucky courts look to the general foreseeability of harm, not to whether the particular, precise form of injury could be foreseen.[21] It is enough that injury of some kind to some person within the natural range of effect of the alleged negligent act could have been foreseen.[22] The Court of Appeals held that 18 U.S.C. § 922 was relevant to that inquiry in the instant case and we agree.

It is beyond reasonable dispute that a principal purpose of 18 U.S.C. § 922 is to limit access to handguns in an effort to keep these inherently dangerous weapons from the hands of irresponsible persons.[23] This policy is as important in Kentucky as elsewhere and serves the safety interest of all Kentucky citizens. While we recognize that eighteen-year-olds are not prohibited from possessing handguns under Kentucky law[24] or under federal law,[25] and that neither Kentucky law nor federal law prohibits a "person" from providing an eighteen-year-old with a hand-

gun,[26] The Castle, as a federally licensed gun dealer, was prohibited from selling a handgun to an eighteen-year-old person.[27] The United States Supreme Court has provided the rationale as follows:

[I]t is apparent that the focus of the federal scheme is the federally licensed firearms dealer, at least insofar as the Act directly controls access to weapons by users. Firearms are channeled through dealers to eliminate the mail order and the generally widespread commerce in them, and to insure that, in the course of sales or other dispositions by these dealers, weapons could not be obtained by individuals whose possession of them would be contrary to the public interest.[28]

The Gun Control Act regulates the means by which lawful ownership of handguns may be acquired through licensed dealers. These regulations have a direct bearing on our view of foreseeability. Generally, a retail transaction does not encompass a great deal of interaction between the seller and the buyer. A seller or dealer of an ordinary product, normally, has no obligation to evaluate whether the buyer is fit to possess the product being sold. However, because of the dangerous nature of handguns, The Gun Control Act imposes special obligations on licensed dealers that sell handguns. Congress has determined that licensed dealers shall limit the sale of handguns to qualified persons;

19. *Grand Aerie Fraternal Order of Eagles v. Carneyhan,* 169 S.W.3d 840, 849.

20. *Claywell,* 736 S.W.2d 328.

21. *Miller v. Mills,* 257 S.W.2d 520 (Ky.1953).

22. *Id.*

23. *Huddleston v. United States,* 415 U.S. 814, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974).

24. KRS 527.100(1).

25. 18 U.S.C. § 922(x)(2); 18 U.S.C. § 922(x)(5).

26. KRS 527.110(1)(a). 18 U.S.C. § 922(x)(1); 18 U.S.C. § 922(x)(5).

27. 18 U.S.C. § 922(b)(1).

28. *Huddleston,* 415 U.S. at 825, 94 S.Ct. 1262.

that such firearms shall not be sold to a person under twenty-one.[29] While this Court has no duty to observe the foregoing standard, neither are we prohibited from borrowing it as the proper standard in cases brought under our common law. Moreover, there can be no doubt that the licensed firearms dealers industry is bound by this standard and to apply it to Kentucky common-law actions would impose no new or onerous burden on the industry. However, our decision herein should not be misunderstood to expand or modify existing law with respect to the transfer or entrustment of firearms outside of the federal regulatory scheme.

The Gun Control Act establishes three age-related classifications. First, individuals under eighteen can only possess handguns under limited circumstances and with their parents' or guardian's permission[30] and no person or licensed dealer may sell a handgun to an individual under eighteen.[31] Individuals twenty-one and older may possess handguns and any person or licensed dealer may sell a handgun to an individual twenty-one or older, provided other requirements are met. Individuals between eighteen and twenty-one may possess handguns, and a "person", but not a licensed dealer may sell a handgun to such an individual.[32]

While not a model of clarity or consistency, the regulatory scheme is purposeful. Those under eighteen are deemed to be, as a matter of law, incompetent, or too immature to possess a handgun without adult supervision. Those twenty-one and older are deemed to be, as a matter of law, competent, or mature enough to possess a

handgun without such supervision. However, eighteen to twenty-one is a transitional period. The Act seems to recognize that some persons in this age group are mature enough to possess a handgun without supervision while others are not. Thus, the Act attempts to balance the rights of those individuals with a concern for the public interest in keeping handguns away from those who are not mature enough to possess them without supervision. It does so by making it more difficult for persons within the relevant age group to purchase a handgun from one who is totally indifferent to the buyer's aptitude for safely using a handgun, i.e., the commercial dealer in a retail transaction. The result of this restriction is that individuals between eighteen and twenty-one may lawfully obtain possession of a handgun, if at all, only through one who is not a licensed dealer, presumably, one who may evaluate his or her aptitude for possessing a handgun. Admittedly, a person may conduct a private sale of a handgun to an individual in the relevant age group if she or he is not engaged in the business of selling firearms. However, one who sells more than five firearms per year is likely to be deemed to be engaged in the business and would be bound by the provisions of the Gun Control Act.[33]

The rational application of negligence law requires the existence of a duty of care under the circumstances. As discussed hereinabove, the provisions of the Gun Control Act represent a reasonable and satisfactory duty to impose upon licensed gun dealers in Kentucky. Whether the Castle breached such a duty of care will be

---

**29.** 18 U.S.C. § 922(b)(1).

**30.** 18 U.S.C. § 922(x)(2); 18 U.S.C. § 922(x)(3).

**31.** 18 U.S.C. § 922(x)(1).

**32.** 18 U.S.C. § 922(x)(1); 18 U.S.C. § 922(b)(1).

**33.** *See,* Philip J. Cook & James Blose, *State Programs for Screening Handgun Buyers,* 455 Annals 80, 84 (1981).

for the trier of fact, as will be the other elements of compensable negligence.

We also acknowledge The Castle's argument, rejected by the Court of Appeals, that Scott's conduct was a superseding cause relieving The Castle of liability. As the Court of Appeals noted, this Court has rejected "any all-inclusive general rule that ... criminal acts of third parties ... relieve the original negligent party from liability." [34] Given our analysis herein, we cannot say as a matter of law that Scott's act was so extraordinary and unforeseeable as to relieve The Castle of liability in the event that a jury determines that the negligence of the Castle was a substantial factor in causing Jennifer's injuries. We therefore affirm the Court of Appeals and remand the cause to the trial court for proceedings consistent with this opinion.

LAMBERT, C.J., and COOPER, JOHNSTONE, SCOTT, and WINTERSHEIMER, JJ., concur.

ROACH, J., files a separate opinion concurring in part and dissenting in part in which GRAVES, J., joins.

Opinion by Justice ROACH, concurring in part and dissenting in part.

I concur with the majority opinion's conclusions that (i) there is no private civil remedy under the Federal Gun Control Act, and (ii) KRS 446.070's use of "any statute" is limited to Kentucky statutes. However, because I believe that the Supreme Court of Kentucky should look to Kentucky public policy in determining the boundaries of the universal duty of care in this state, I dissent.

I begin by noting that nothing in Kentucky law prohibits anyone from transferring a handgun to an eighteen-year-old individual. Rather, the General Assembly,

by statutes enacted in 1994, has drawn that line at persons under the age of eighteen, specifically by criminalizing the act of providing a handgun to someone under eighteen, outside certain situations. *See* KRS 527.100—.110. Whether the policy behind these statutes is the correct choice is irrelevant to our analysis. The simple fact remains that Kentucky's arbiter of public policy—the General Assembly—has simply chosen not to embrace those aspects of the Federal Gun Control Act that limit the sale of guns to persons under the age of twenty-one. In short, I think that the General Assembly's refusal to pass a law that incorporates the relevant Federal standard, particularly given its express adoption of a different standard, is a clear statement of the relevant public policy in Kentucky and is therefore fundamental to the resolution of the question before us.

As the majority correctly points out, we have recently stated that the "universal duty of care" is not boundless. *Grand Aerie Fraternal Order of Eagles v. Carneyhan,* 169 S.W.3d 840, 849 (Ky.2005). In determining the appropriate boundaries of that duty, "consideration must be given to public policy, statutory and common law theories in order to determine whether a duty existed in a particular situation." *Id.* (quoting *Fryman v. Harrison,* 896 S.W.2d 908, 909 (Ky.1995)). Although the majority has engaged in this process to a certain extent, its analysis has focused on the impact of federal law on how the duty of care should be defined. Specifically, the majority opinion embraces the Federal Gun Control Act as defining the boundaries of Kentucky's common law duty of care as it relates to the sale of guns.

I believe, however, that when determining the scope of the duty of care under Kentucky law, we should be guided by

**34.** *Britton v. Wooten,* 817 S.W.2d 443, 449 (Ky.1991).

Kentucky public policy, statutory and common law theories. Though this approach may seem somewhat counter-intuitive—since it leads to the seemingly paradoxical notion that a violation of federal criminal law would not violate a state's common law duty of care—it is a necessary aspect of a system of dual-sovereign federalism. The federal courts recognize this concept in diversity jurisdiction cases and rely on state law principles to decide all substantive questions, while eschewing, for the most part, any notion of a federal common law of torts.

> Except in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state. And whether the law of the state shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of federal concern. There is no federal general common law. Congress has no power to declare substantive rules of common law applicable in a state whether they be local in their nature or 'general,' be they commercial law or a part of the law of torts. And no clause in the Constitution purports to confer such a power upon the federal courts.

*Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *see also Hanna v. Plumer,* 380 U.S. 460, 465, 85 S.Ct. 1136, 1141, 14 L.Ed.2d 8 (1965) ("[*Erie* ] held that federal courts sitting in diversity cases, when deciding questions of 'substantive' law, are bound by state court decisions as well as state statutes. The broad command of · *Erie* was therefore identical to that of the Enabling Act: federal courts are to apply state substantive law and federal procedural law."). If the federal courts have been unwilling to impose a federal common law rule, why should we do so?

The obvious rejoinder is that the majority opinion is not imposing a federal common law rule, but that it is instead adopting a state common law rule that just happens to be informed by a federal statute. But it does so while stating that the federal statute is merely a criminal statute which creates no federal private right of action. Stranger still, the majority chooses to apply the federal standard of correct behavior despite the fact that the General Assembly has also spoken on the issue.

Were the Court writing on a blank slate, reference to and reliance on the federal statute as evidence of the applicable standard of care might be appropriate. But the Court is not addressing an area in which the General Assembly has been silent. To the contrary, the General Assembly has spoken loud and clear on this issue. We should defer to its declaration of the public policy of Kentucky. *See Schork v. Huber,* 648 S.W.2d 861, 863 (Ky.1983) ("The enunciation of public policy is the domain of the General Assembly. We do not propose to invade their jurisdiction in any respect. The courts interpret the law. They do not enact legislation."); *Fann v. McGuffey,* 534 S.W.2d 770, 779 (Ky.1975) ("It is elementary that the legislative branch of government has the prerogative of declaring public policy and that the mere wisdom of its choice in that respect is not subject to the judgment of a court."); *Pyles v. Russell,* 36 S.W.3d 365, 368 (Ky. 2000) ("The enunciation of public policy is the domain of the General Assembly.").

The Castle unquestionably violated a federal criminal law and is subject to federal criminal prosecution for its actions. That, however, should be the limit of the role of federal law in this matter, since, as the majority has held, Congress did not also create a private cause of action under the Federal Gun Control Act. I would note that it is not surprising that the General

Assembly has a different view of firearms than Congress given the long tradition of firearms ownership in Kentucky. *See Posey v. Commonwealth,* 185 S.W.3d 170, 184–87 (Ky.2006) (Scott, J., dissenting) (discussing in detail Kentucky's long history of support of gun rights and gun ownership). But absent express statutory preemption by Congress, e.g., by creating a civil remedy, our own public policy, as announced by the General Assembly, should control in this matter. I for one believe that the public policy of our Commonwealth is best defined by the elected representatives from places like Sandy Hook, Allen, Winchester, Fairdale, Tompkinsville, and Paducah—not by representatives from Massachusetts, New York, California, Florida, Wisconsin, Oregon, and Hawaii.

Because The Castle did not violate any duty under Kentucky law when it sold a handgun to Scott Greer, I respectfully dissent.

GRAVES, J., joins this opinion, concurring in part and dissenting in part.