NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0454n.06

Case No. 20-6381

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Nov 09, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| MELISSA MONDAY-WEST, as Administratrix of the Estate of Stanford Lynn West; JAMES D. LYON, as Chapter 7 Trustee for the Bankruptcy Estate of Melissa Monday-West, | ) ) ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY |
| Plaintiffs - Appellants, | ) ) | |
| v. | ) ) | OPINION |
| WELLS FARGO BANK, N.A., | ) | |
| Defendant - Appellee. | ) | |

Before: BOGGS, LARSEN, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge.

Melissa Monday-West, as Administratrix of the Estate of Stanford Lynn West, and James D. Lyon, as Chapter 7 Trustee for the Bankruptcy Estate of Melissa Monday-West (collectively, the "Wests"), filed this lawsuit against Wells Fargo Bank, N.A. ("Wells Fargo") following Wells Fargo's undisputed wrongful denial of their request for a loan modification pursuant to the Home Affordable Modification Program ("HAMP"). The Complaint claims common-law fraud and both negligent and intentional infliction of emotional distress ("NIED" and "IIED," respectively) under Kentucky law. The district court granted Wells Fargo's motion to dismiss all of the Wests' claims, finding that despite the bank's admission that it wrongfully denied the Wests' loan modification, each of their state-law claims fail because they failed to show causation. The district court

interpreted Kentucky law on causation to require the Wests to allege that if Wells Fargo had approved them for a Trial Period Plan ("TPP")—a prerequisite to obtaining a permanent loan modification—they would have satisfied the requirements of the TPP and Wells Fargo would have approved them for a loan modification, in order to overcome a motion to dismiss. But the Wests' Complaint makes no such claim, so the district court granted the motion to dismiss.

We find that the claims fail at an earlier stage of the inquiry, and for the reasons set forth below, we affirm the judgment of the district court.

I.

When reviewing a lower court's order dismissing an action under Federal Rule of Civil Procedure 12, this court applies a de novo standard and accepts all well-pleaded facts in the Complaint as true. *See Mik v. Fed. Home Loan Mortg. Corp.*, 743 F.3d 149, 156-57 (6th Cir. 2014). The court may also consider documents attached to the Complaint and take judicial notice of public records. *See Jackson v. City of Columbus*, 194 F.3d 737, 745 (6th Cir. 1999) (The court may consider public records and matters of which a court may take judicial notice.), *abrogated on other grounds by Swierkiewicz v. Sorema*, 534 U.S. 506 (2002). The court does so here both to provide background and to summarize the operation of HAMP.

**The Home Affordable Mortgage Program**

During the early and mid-2000s, the housing market and mortgage industry in the United States underwent substantial growth. But both the rate of growth and stability of the market were unsustainable, resulting in a housing bubble that burst around 2008, causing housing values to sink. Many Americans found themselves upside down on their mortgages, meaning they owed more than the value of their homes, and a significant number faced foreclosure due to defaults. In response, Congress enacted the Emergency Economic Stabilization Act, Pub. L. No. 110–343, 122

Stat. 3765, to "provid[e] stability to and prevent[] disruption in the economy and financial system. . . ." Among other things, the Act authorized the Secretary of the Treasury to "use loan guarantees and credit enhancements to facilitate [mortgage] loan modifications to prevent avoidable foreclosures." 12 U.S.C. § 5219(a). Pursuant to this authority, the Secretary created HAMP, which incentivizes loan servicers to help homeowners avoid foreclosure by refinancing mortgages at interest rates more favorable to borrowers. *Id.* The Secretary provides monetary and other incentives to participating loan servicers each time the servicer agrees to modify a loan under the program.

In Supplemental Directive 09-01, the Secretary provides criteria, and offers optional software, for loan servicers to use to determine borrowers' eligibility for HAMP.[1] Loan servicers may also use their own software to evaluate borrowers under the same criteria. *Id.* If a borrower meets the criteria, the Secretary directs that participating loan servicers "MUST offer the modification." *Id.* at 4.

The modification process consists of two stages: First a TPP, then a permanent loan modification. *Id.* at 18. After a loan servicer determines that a borrower is eligible, the borrower must comply with the terms of a TPP agreement, which requires the borrower to make payments in specified amounts and provide documentation in a manner similar to the loan servicing requirements for loans in forbearance. *Id.* If the borrower complies with the TPP terms, the permanent loan automatically goes into effect at the end of the trial period. *Id.*

---

[1] *See* U.S. Dep't of Treasury, Supp. Dir. 09-01, at 5 (Apr. 9, 2009), available at: https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd0901.pdf (last accessed Aug. 31, 2022).

**Wells Fargo's Participation in HAMP**

Wells Fargo was a loan servicer participant in HAMP at all times relevant to this lawsuit. It elected to use its own software, rather than the optional software provided by the Secretary, to determine borrowers' eligibility for loan modifications. The bank, however, did not audit its software to verify the accuracy of its eligibility determinations in accordance with the criteria set forth by the Secretary. In fact, the Office of the Comptroller of the Currency ("OCC") investigated Wells Fargo in 2010 and found that it "failed to devote adequate oversight to its foreclosure processes, failed to ensure compliance with applicable laws, and failed to adequately audit its foreclosure procedures." After the investigation, Wells Fargo signed two consent orders in 2011 pledging "to maintain adequate governance and controls to ensure compliance with HAMP; to engage in ongoing testing for compliance with HAMP; and to ensure that the bank's mortgage modification and foreclosure practices were regularly reviewed and any deficiencies promptly detected and remedied." Wells Fargo also agreed that a Compliance Committee and an Audit and Examination Committee, comprised of its board members, would monitor its compliance with the consent orders.

Nevertheless, in June 2015, about four years after Wells Fargo signed the consent orders, the OCC found that Wells Fargo had not been complying with the orders. Errors stemming from this noncompliance led Wells Fargo to wrongfully deny mortgage modifications to 184 borrowers between 2013 and 2014. The OCC noted several compliance issues, including that Wells Fargo had not ensured that its audit and compliance programs were sufficient to identify and promptly resolve deficiencies in its mortgage-modification and foreclosure practices. The OCC also questioned whether Wells Fargo was making good-faith efforts, consistent with HAMP, to modify delinquent mortgage loans and prevent foreclosures. As a result, the OCC prohibited Wells Fargo

from taking on additional residential-mortgage-servicing business until it reached compliance with the consent orders. The OCC and Wells Fargo also entered a stipulation and order in May 2016, in which Wells Fargo accepted a $70 million civil penalty and acknowledged the error that led to the wrongful loan-modification denials in 2013 and 2014, discussed above.

In February 2018, the Federal Reserve Board ("FRB") got involved, announcing that it would "prohibit Wells Fargo from expanding its business until it sufficiently improves its governance and controls." The FRB followed up with a cease-and-desist order against Wells Fargo, requiring it to submit a plan to improve and maintain control over its processes including effective testing and validation measures for compliance with applicable laws. After the cease-and-desist order, Wells Fargo disclosed to its shareholders in its second-quarter 2018 Form 10-Q that, due to an error in its software, the bank improperly denied loan modifications to approximately 625 eligible borrowers beginning on April 12, 2010, until it discovered and corrected the error on October 20, 2015. In its next quarterly 2018 Form 10-Q, Wells Fargo disclosed that it discovered additional instances of wrongful denials, raising the number of affected borrowers to approximately 870 and the resulting wrongful foreclosures to approximately 545.

### Wells Fargo Denies the Wests' Application for a Loan Modification

Against this backdrop, the Wests took out two mortgage loans on a home that they co-owned in Lexington, Kentucky. Wells Fargo serviced both loans and owned one, while Fannie Mae owned the other. After defaulting on the loans, on or about December 28, 2011, the Wests applied for a loan modification. Using its own software to evaluate their eligibility for a loan modification, Wells Fargo extended them a temporary modification under the Home Affordable

Unemployment Program.[2] Once the Wests completed that program, Wells Fargo requested that they submit documentation required to apply for a HAMP loan modification. The Wests submitted the requested information, but Wells Fargo denied their application on October 2, 2012.

The Wests promptly began the process of submitting a second application for a HAMP loan modification, which was not facially complete until November 30, 2012. In the meantime, Wells Fargo filed a foreclosure action against the Wests on November 2, 2012. Wells Fargo reviewed the Wests' second application on December 13, 2012, and again concluded that they were not eligible for a loan modification. It sent the Wests a letter denying the second application on February 12, 2013, explaining that their income—the same income they submitted for their application for the Home Affordable Unemployment Program—was not sufficient to qualify for a loan modification under HAMP. Unable to pay the principal balance of their loan without a modification, the Wests filed for Chapter 13 bankruptcy. But Fannie Mae objected to their proposed plan of reorganization because of the pre-petition mortgage arrearages and the reorganization failed. The case was subsequently bifurcated, resulting in Melissa West's case being converted to a Chapter 7 case and discharged, and Stanford West's being dismissed without discharge. The Fayette County Circuit Court subsequently issued a foreclosure judgment on the home, and it sold for $208,773.75. Wells Fargo received $174,046.97 of the proceeds.

**Wells Fargo Admits Wrongful Denial of Loan Modification**

On September 11, 2018, after filing Form 10-Q documents disclosing the wrongful denials of loan modifications between 2010 and 2015, Wells Fargo sent a letter to the Wests informing them that they were among the affected. The letter stated, in relevant part:

---

[2] While the Home Affordable Unemployment Program goes largely unexplained in the briefing, based on context, it appears to differ from HAMP in that it does not offer the opportunity for a permanent loan modification.

> We have some difficult news to share. When you were considered for a loan modification, you weren't approved, and now we realize that you should have been. We based our decision on a faulty calculation, and we're sorry. If it had been correct, you would have been approved for a trial modification. We want to make things right.

The bank enclosed a check for $15,000 and offered to pay for a mediator to further resolve any issues if the Wests found such measures appropriate. The Wests filed this suit.

II.

We review de novo a district court's order granting a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). We "construe the allegations of the complaint in the light most favorable to plaintiffs [and] accept all well-pled factual allegations as true." *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 597 (6th Cir. 2013). In so doing, "we may affirm on any grounds supported by the record, even if different from the grounds relied on by the district court." *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 569 (6th Cir. 2001). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Lindke v. Tomlinson*, 31 F.4th 487, 495–96 (6th Cir. 2022) (quoting *Middlebrooks v. Parker*, 15 F.4th 784, 789 (6th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (internal quotation marks omitted)). "This plausibility standard requires the plaintiff to plead 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

In diversity cases like this one, the court applies state substantive law in accordance with the controlling decisions of the Kentucky Supreme Court. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994). If the state Supreme Court has not yet addressed an issue presented, this court must predict how it would

rule, by looking to "all relevant data," including state appellate decisions. *Kingsley Assocs., Inc. v. Moll PlastiCrafters*, *Inc.*, 65 F.3d 498, 507 (6th Cir. 1995).

### III.

The Complaint alleges that Wells Fargo's erroneous representation that the Wests did not qualify for a loan modification coupled with its failure to disclose its error gives rise to claims of fraudulent omission, NIED, and IIED. The district court rejected each of these claims, finding that the Complaint did not plausibly establish causation. A fresh look at the issues presented leads our analysis of the fraud and negligence claims to focus on the first element required for each claim: the existence of a duty, rather than on causation, which is typically evaluated after duty has been established. *See Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 610-11 (6th Cir. 2005) ("[B]ecause our review of a district court's determination of a motion to dismiss is de novo . . . . it is appropriate . . . to consider the merits of [the] [p]laintiffs' claims . . . despite the absence of a district court holding in that regard."). Duty is not an element of an IIED claim, but the claim fares no better, as we agree that the Complaint does not sufficiently plead the elements of such a claim.

As an initial matter, we accept the Wests' contention that the Complaint claims, or at least attempts to claim, fraudulent omission. The Wests label Count One as "Common Law Fraud," and allege that Wells Fargo both made material misrepresentations and concealed information that it had a duty to disclose. Wells Fargo insists that Plaintiffs' claim is for fraudulent misrepresentation and not fraudulent omission. Yet, throughout their briefing at the district court and here, the Wests maintain that the Complaint alleges fraudulent omission, not fraudulent misrepresentation. Viewing the Complaint in the light most favorable to the Wests, the common-law-fraud count plainly alleges that Wells Fargo withheld information that it had a legal duty to disclose. And, unlike fraudulent misrepresentation, which centers on an affirmative misstatement,

a claim of fraud by omission is "grounded in a duty to disclose." *Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 255 (6th Cir. 2012) (quoting *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011)). While the Wests also allege that the bank made misrepresentations on which they reasonably relied, they explicitly abandon any claim for fraudulent misrepresentation by declaring that the Complaint does "not allege that Wells Fargo made a misrepresentation regarding their loan modification[,]" but instead alleges fraudulent omission. Moreover, the Wests do not otherwise address fraudulent misrepresentation in their briefing. A claim raised in a complaint but unaddressed by a plaintiff in its response to a dispositive motion is deemed abandoned. *See Engler v. Arnold*, 862 F.3d 571, 577 (6th Cir. 2017) (declining to disturb district court's finding that the plaintiff abandoned claim by failing to address it in response to dispositive motion). As such, we analyze the common law fraud count as a claim for fraudulent omission, which both parties have briefed.

"To prevail on [a fraud by omission] claim, a plaintiff must prove: (1) the defendant had a duty to disclose the material fact at issue; (2) the defendant failed to disclose the fact; (3) the defendant's failure to disclose the material fact induced the plaintiff to act; and (4) the plaintiff suffered actual damages as a consequence." *Republic Bank & Tr. Co*, 683 F.3d at 255 (internal quotation marks omitted). Whether a duty to disclose exists is a question of law for the court. *Nationwide Agribusiness Ins. Co. v. Thompson*, 2022 WL 1194020, at *11 (Ky. Ct. App. Apr. 22, 2022) (citing *Giddings & Lewis, Inc.*, 348 S.W.3d at 747). A duty to disclose arises under four circumstances in Kentucky: (1) a confidential or fiduciary relationship between the parties; (2) a duty created by statute; (3) when a defendant has created the impression of full disclosure to the plaintiff but has only partially disclosed material facts; and (4) when a party to a contract fails to

disclose superior knowledge that the other party relied on it to disclose. *Giddings*, 348 S.W.3d at 747–48.

For their part, the Wests do not identify any of the circumstances laid out in *Giddings* as the source of the duty on which they premise their fraud by omission claim. Instead, they argue that Wells Fargo "admitted it violated a duty owed" to the Wests when it sent them an apology letter stating that it erred in processing their application for a loan modification. Yet, the Wests do not explain how this admission of error creates a duty. Nor do they point to any authority identifying the source of a legal duty under similar circumstances. The Wests cite a Seventh Circuit case and a number of district court opinions from other states that they say demonstrate the viability of their claims. But none of those cases aids our analysis as they do not apply Kentucky law. Moreover, the Complaint does not otherwise plead that a duty arose out of one of the four circumstances permitted under Kentucky law.

Turning to the first category under which a duty may arise, the Complaint does not allege a confidential or fiduciary relationship between the Wests and Wells Fargo. This may be because, "[e]xcept in special circumstances, a bank does not have a fiduciary relationship with its borrowers." *In re Sallee*, 286 F.3d 878, 893 (6th Cir. 2002); *see also Snow Pallet, Inc. v. Monticello Banking Co.*, 367 S.W.3d 1, 4 (Ky. Ct. App. 2012) ("As a general rule, banks do not owe a fiduciary duty to their customers."). In 2002, this court noted that there are only two instances where Kentucky courts have found special circumstances present in a relationship between a bank and a borrower, both of which involved the "bank profit[ing] at the borrower's expense from confidential information received from the borrower." *See In re Sallee*, 286 F.3d at 893. In the first instance, "the bank used the confidential business plans of one borrower to help one of the borrower's competitors generate new business for the bank." *Id.* (citing *Steelvest, Inc.*

*v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485–86 (Ky. 1991)).  Similarly, in the second instance, "the bank usurped a corporate opportunity of one of its borrowers that the borrower revealed to the bank in confidence."  *Id.* (citing *Henkin, Inc. v. Berea Bank & Trust Co.*, 566 S.W.2d 420, 422 (Ky. Ct. App. 1978).  In 2012, the Court of Appeals of Kentucky cited *In re Sallee*, *Steelvest*, and *Henkin* in finding that, although the plaintiff may have identified a conflict of interest with respect to the bank's business relationships, no fiduciary duty existed where the plaintiff had not alleged that the bank defendant "profited from any confidence" it gained through the plaintiff.  *Snow Pallet*, 367 S.W.3d at 5.  The same is true here; the Wests have not alleged any misuse of confidential information.  In particular, while the Complaint alleges that Wells Fargo profited from the foreclosure sale, it does not allude to any confidential information that Wells Fargo gained through the Wests to secure this profit.  *See In re Sallee*, 286 F.3d at 893 ("Without a great deal more, a mere confidence that a bank will act fairly does not create a fiduciary relationship. . . .").  As such, the Wests cannot establish that a duty arose out of a fiduciary relationship or the bank's  disclosure of confidential information.

There are also no statutory grounds establishing a duty.  Viewing the Wests' argument generously, they attempt to identify a statutory duty deriving from HAMP's directive.  In particular, they point out that HAMP requires mortgage servicers to offer loan modifications to borrowers who meet certain threshold requirements, and they included allegations to this effect in their complaint.  Thus, the Wests argue, Wells Fargo's failure to disclose its mistaken eligibility assessment and two resultant wrongful denials of a temporary loan modification violated the bank's duty under HAMP to provide loan modifications for eligible borrowers.

Wells Fargo counters that HAMP does not create a private right of action.  While Wells Fargo is right that HAMP alone does not provide for a private right of action, it does not necessarily

prohibit state-law claims; even where a violation of a federal law is used for support. *See, e.g.*, *Mik*, 743 F.3d at 166 (agreeing with the Seventh Circuit that a "violation of federal law can support a state law claim, even when—or, perhaps, *especially* when—there is no private right of action under a federal statute") (citing *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 554) (7th Cir. 2012)). Still, the Wests point to no case law, and we have found none, supporting the idea that HAMP's requirement that mortgagees offer loan modifications to borrowers who qualify gives rise to a statutory duty of disclosure on Wells Fargo to borrowers. *See Wigod*, 673 F.3d at 574 (finding that the plaintiff was right that HAMP imposes a requirement on servicers, but that the obligation is owed to mortgagors in the HAMP modification process, not the public). Indeed, as the servicer on the two loans at issue, arguably Wells Fargo's obligation was to the mortgagees— in this case Fannie Mae and itself—not to the Wests as mortgagors. *Id.*[3] Hence, the Wests' allegations are insufficient to plausibly establish that Wells Fargo owed it a statutory duty.

The Complaint's allegations also fail to plausibly establish a duty based on either the third or fourth circumstances. Wells Fargo argues that it had no duty to disclose under either the partial disclosure or superior-knowledge theories because the Wests admit that Wells Fargo did not know about its calculation error when it inaccurately represented to the Wests that they did not qualify for a trial loan modification. We agree. "Only when a partial disclosure makes the spoken words materially misleading does the omission become actionable." *Gresh v. Waste Servs. of Am., Inc.*, 311 F. App'x 766, 773 (6th Cir. 2009) (citing *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 469 (Ky. 1999)). There was no partial disclosure of the error because the bank was unaware of it. And only "where one party to a contract has superior knowledge and is relied upon to disclose

---

[3] Additionally, the bank argues that HAMP is a program created pursuant to the authority of a federal statute but is not itself a statute. The court need not address this issue, as the Complaint does not establish that Wells Fargo owed a duty to the Wests under HAMP.

same," will the superior-knowledge circumstance create a duty. *Giddings*, 348 S.W.3d at 748. To show superior knowledge, the Wests must first demonstrate contractual privity with the bank, and then show that the bank "possess[ed] superior knowledge of the facts affecting the subject-matter of the contract [and did] not disclose those facts" to the Wests even though the bank knew that the Wests were "ignorant thereof, and relie[d], and [could] only rely, on [the bank] to make a full disclosure." *Roberts v. Parsons*, 242 S.W. 594, 595 (Ky. 1922); *Helm v. Ratterman*, No. 2020-CA-1434-MR, 2022 WL 495613, at \*6 (Ky. Ct. App. Feb. 18, 2022) ("The Sixth Circuit, in analyzing Kentucky case law, recognized that the "superior knowledge" duty requires contractual privity."). Here, Wells Fargo denied the Wests' applications in 2012 and 2013 but did not find out that it erred in doing so until 2015, well after the Wests' home had already been foreclosed on and sold in 2014. Further, after Wells Fargo learned of the error, it disclosed it to the Wests. Though Wells Fargo disclosed the issue with its software to the Wests almost three years after discovering that it affected their application for a loan modification, the tardy notification does not affect resolution of the superior knowledge or partial disclosure questions.

In any event, the Wests do not allege or argue in their briefing that Wells Fargo partially disclosed any known material fact with respect to their eligibility for a loan modification so as to "create[] the impression of full disclosure." *Giddings*, 348 S.W.3d at 747. Nor do they argue that the bank failed to disclose facts for which it possessed superior knowledge that affected the subject matter of any contract relevant to their claim. Rather, they lay out historical fact recitations of the bank's failure to adequately maintain its systems. This recitation, however, does not include any allegation that the particular system error that led to the denial of a temporary loan modification was known to Wells Fargo in October of 2012 or February 2013 when the Wests received word of their denials. To be sure, Wells Fargo's record of compliance with HAMP leaves much to be

desired; it was twice ordered in 2011 alone to do better to ensure compliance. And based on the bank's discovery of subsequent errors, it apparently continued to struggle. But neither the Complaint's allegations nor any of its exhibits identify the calculation error at issue in the West's denial such that the court can reasonably infer the bank's superior knowledge. Indeed, Wells Fargo's storied difficulty with properly handling home foreclosures following the housing market collapse was, at minimum, publicly documented in the referenced consent orders. Thus, the Wests' allegations do not establish that their relationship with Wells Fargo exceeded the bounds of an everyday arms-length business transaction such that Wells Fargo owed them a duty under the third or fourth circumstances. And, "[w]hen the first circumstance (a fiduciary duty) does not exist, the courts have been careful not to apply the other three circumstances so broadly as to transform everyday, arms-length business transactions into fiduciary relationships." *Gresh*, 311 F. App'x at 772.

IV.

Likewise, the Wests fail to identify any duty to support their NIED claim. To prevail on an NIED claim, a plaintiff must first prove the elements of a common law negligence claim: "(1) the defendant owed a duty of care to the plaintiff, (2) breach of that duty, (3) injury to the plaintiff, and (4) legal causation between the defendant's breach and the plaintiff's injury" that results in "severe" or "serious" emotional injury. *Osborne v. Keeney*, 399 S.W.3d 1, 17 (Ky. 2012) (retracting from the "impact rule," under which it formerly required some form of physical impact as a prerequisite for a claim of emotional injury). With respect to the element of duty in the context of a negligence claim, Kentucky "has adopted a 'universal duty of care' which requires every person to exercise ordinary care in his activities to prevent foreseeable injury." *T & M Jewelry, Inc. v. Hicks ex rel. Hicks*, 189 S.W.3d 526, 530 (Ky. 2006). But "of course, . . . the 'universal

duty of care' is not boundless." *Id.* at 531. The Wests seem to couch the bank's actions in terms of its responsibility to comply with HAMP. Yet, in *Zusstone v. Bank of America N.A.*, the Court of Appeals of Kentucky noted that it was "aware of no Kentucky caselaw specifically addressing whether a plaintiff may maintain a state-law negligence claim based on a HAMP violation," and like the parties in this case, the parties in *Zusstone* had cited none. No. 2017-CA-001063-MR, 2019 WL 4565544, at *3 (Sept. 20, 2019). As such, the court looked to the Kentucky Supreme Court's most appropriate case law. *Id.* More specifically, it explained that Kentucky has codified the common-law doctrine of negligence per se under Ky. Rev. Stat. Ann. § 446.070 (West), but the Kentucky Supreme Court limited its application to state statutes, not federal statutes and regulations or local ordinances. *Id.*; *see also T & M Jewelry*, 189 S.W.3d at 530. And while a complete reading of *T & M Jewelry* suggests that Kentucky would find the existence of a duty if presented with persuasive "public policy, statutory and common law theories," the parties here have pointed to nothing of the sort. 189 S.W.3d at 531; *see also Zusstone*, 2019 WL 4565544, at *3 (stating that "[i]f the federal court for the Western District of Kentucky had not" been the first to say that a party cannot "base her negligence claim on HAMP violations," "this [c]ourt would have."). Further, "[a]s a general matter, a mortgagee has no duty to reach an agreement on a loan modification with a mortgagor in default." *SMA Portfolio Owner, LLC v. Corporex Realty & Inv., LLC*, 112 F. Supp. 3d 555, 572 (E.D. Ky. 2015), *aff'd sub nom. Bank of Am., N.A. v. Corporex Realty & Inv. Corp.*, 661 F. App'x 305 (6th Cir. 2016).

Here, as discussed in the fraud analysis above, the Wests cannot establish any duty arising from a statute, common law, or a confidential or fiduciary relationship. And they point to no Kentucky cases imposing a duty of care by servicers or mortgagees to borrowers. *See Rush v. Mac*, 792 F.3d 600, 605 (6th Cir. 2015) (finding no duty arising from HAMP under a state law

where HAMP does not create a private right of action and the state has not recognized such a duty). The Wests attempt to fill this void by arguing that Kentucky's voluntary-assumption-of-duty rule applies. But the voluntary-assumption rule applies only where physical harm is alleged. *See Morgan v. Scott*, 291 S.W.3d 622, 632 (Ky. 2009) (confirming that Kentucky has "adopted the Restatement (Second) of Torts § 324A regarding the elements necessary for liability for the breach of a voluntarily assumed duty."); Restatement (Second) of Torts § 324A (noting that one who voluntarily undertakes to render services to another is subject to liability "for *physical harm* resulting from his failure to exercise reasonable care to protect his undertaking . . . .") (emphasis added). The Wests make no such allegation here. Accordingly, the Complaint does not state a claim for NIED because the Wests fail to identify any duty of care owed to them by Wells Fargo.

V.

Finally, the Complaint contains an IIED claim, arguing that Wells Fargo's conduct in maintaining and failing to timely correct its faulty software system, and concealment of the error from 2015 to 2018 caused the Wests severe emotional distress. Wells Fargo argued, and the district court held that the Wests' claim failed to plausibly establish that Wells Fargo's conduct was the cause of their alleged harm. We do not deem it necessary to analyze causation, as we find that the Complaint fails to adequately allege the outrageous conduct element of IIED and thus does not state a plausible claim for relief.

As this court explained in *Mik*, 743 F.3d at 169, the Kentucky Supreme Court recognized the tort of outrageous infliction of emotional distress in *Craft v. Rice*, 671 S.W.2d 247, 251 (1984). The elements of the claim are:

1. The wrongdoer's conduct must be intentional or reckless;
2. The conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality;

    3. There must be a causal connection between the wrongdoer's conduct and the emotional distress; and

    4. The emotional distress must be severe.

*Id.* (quoting *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 65 (Ky. 1996)). "The standards for this tort are strict." *Id.* (quoting *Mineer v. Williams*, 82 F.Supp.2d 702, 706 (E.D.Ky.2000)). The Kentucky Supreme Court has emphasized that a showing of IIED requires allegations of conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Mik*, 743 F.3d at 169 (internal quotation marks and citation omitted). As we noted in *Mik*, Kentucky courts have been strict in assessing proof of outrageous conduct. Examples of such conduct include instances in which the defendant:

> (1) harassed the plaintiff by keeping her under surveillance at work and home, telling her over the CB radio that he would put her husband in jail and driving so as to force her vehicle into an opposing lane of traffic; (2) intentionally failed to warn the plaintiff for a period of five months that defendant's building, in which plaintiff was engaged in the removal of pipes and ducts, contained asbestos; (3) engaged in a plan of attempted fraud, deceit, slander, and interference with contractual rights, all carefully orchestrated in an attempt to bring [plaintiff] to his knees; (4) committed same-sex sexual harassment in the form of frequent incidents of lewd name calling coupled with multiple unsolicited and unwanted requests for [] sex; (5) was a Catholic priest who used his relationship [as marriage counselor for] the [plaintiff] husband and the wife to obtain a sexual affair with the wife; (6) agreed to care for plaintiff's long-time companion-animals, two registered Appaloosa horses, and then immediately sold them for slaughter; and (7) subjected plaintiff to nearly daily racial indignities for approximately seven years.

*Id.* (citing *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W. 3d 781, 789-90 (Ky. 2004), *partially overruled on other grounds by Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014)). In *Mik*, Freddie Mac had evicted the plaintiffs, who were renters at a property on which it obtained a foreclosure. The eviction probably violated the Protecting Tenants at Foreclosure Act (PFTA), 112 U.S.C. § 5220. *Id.* at 170. But Freddie Mac's conduct lined up with Kentucky law as it stood

before the passage of the PFTA. *Id.* As such, this court concluded that Freddie Mac's behavior was "unfortunate" but not "extreme" or "atrocious." *Id.* at 169.

The same is true here. Wells Fargo's failure to extend a temporary modification to the Wests appears to have run afoul of HAMP. And its disappointing record of properly maintaining its calculation tool(s) led to multiple court orders for it to audit, correct, and improve its systems. Its conduct was far from perfect and certainly unfortunate, but as previously noted, HAMP permitted lenders to utilize their own calculating tools in assessing borrower eligibility. Thus, Wells Fargo's decision to develop and use its own tool conformed with the rules. The apparent ineffectuality of the tool, which led to the denials, is regrettable but does not meet the high bar for outrageous conduct erected by Kentucky courts. Accordingly, the Complaint does not state a claim for IIED under Kentucky law and the court need not address the remaining elements.

VI.

For the reasons set forth above, we **AFFIRM** the judgment of the district court.